Freddie Lee WEBB, Appellant,

v.

The STATE of Texas, Appellee.

No. 69730.

Court of Criminal Appeals of Texas,
En Banc.

Nov. 9, 1988.

Patrick J. McGuire, Corpus Christi, for appellant.

Grant Jones, Dist. Atty. and Deanie King, Asst. Dist. Atty., Corpus Christi, Robert Huttash, State's Atty., Austin, for the State.

OPINION

CLINTON, Judge.

Appellant was convicted of the offense of capital murder and, in accordance with affirmative answers by the jury to special issues prescribed by Article 37.071(b)(1) and (2), V.A.C.C.P., his sentence was assessed at death. Appeal to this Court is automatic.

In related points of error appellant challenges sufficiency of the evidence to show he perpetrated the killing for which he was convicted.[1] He contends that the circumstantial evidence does no more than to place him at the scene of the crime, without establishing either that he caused the death of the deceased, or that he in any manner solicited, encouraged, directed, aided or attempted to aid anyone in the killing. Hence, he maintains, the evidence fails to support both the jury's verdict that he intentionally killed the deceased in the course of a kidnapping, and its affirmative answer to special issue one, that he "acted deliberately" to cause the death of the deceased. We reject both contentions.

On the night of Sunday, December 8, 1985, Elizabeth Cantu [hereinafter, "Cantu"], was working her first shift as night supervisor of the Ship Ahoy Restaurant in Corpus Christi. At precisely 10:00 p.m., Cantu locked the door to the restaurant and joined her husband, Leopoldo Cantu [hereinafter, "the deceased"], who was waiting for her in the couple's black 1978 Blazer. From there they proceeded to a gas station, and then to a car wash. Here they were accosted by appellant and another black male, and forced at gunpoint into the back seat of their truck. As he drove the Blazer away from the car wash, appellant informed the couple they were "going to go for a ride, get some money and that [Cantu] was going to give it to him, that [they] were going to go back to the Ship Ahoy and [Cantu] was going to open the safe and give him all the money." He made it clear "they wouldn't hesitate" to use their pistols "if they had to[.]" The deceased told appellant, "You can have whatever you want. It doesn't mean anything to us."

Once at the restaurant appellant instructed his accomplice to remain with the deceased in the Blazer with the doors locked while he accompanied Cantu inside. Appellant escorted Cantu at gunpoint into the restaurant office and forced her to open the safe.[2] He then made her lie down behind the desk and, with the cord of an adding machine, proceeded to tie her up.[3] When appellant departed, Cantu managed to free herself and immediately called the police.

Viewed in the light most favorable to the verdict, the evidence shows appellant and his accomplice, still holding the deceased, returned in the Blazer to the car wash to retrieve their own car, and from there proceeded in both vehicles to a location near the intersection of Greenwood and Saratoga, close to the city dump.[4] There Ser-

---

1. The indictment alleges, in pertinent part, that appellant:
   "on or about the 8th day of December, 1985, in Nueces County, Texas, did then and there intentionally cause the death of Leopoldo Cantu by shooting him with a firearm, to wit: a pistol, while in the course of committing and attempting to commit the kidnapping of Leopoldo Cantu[.]"

2. Cantu testified that what was later shown to be one of the pistols used to gun down the deceased, a chrome plated Ruger .357 Magnum revolver, "looks like the same gun" appellant wielded during the robbery.

3. A fingerprint identified as appellant's was subsequently lifted from the cord of the adding machine.

4. Mary Marmolejo testified that sometime shortly past 10:30 p.m., which would have been just after the robbery of Cantu at the Ship Ahoy, she and a friend observed a black Blazer at the car wash, and a black man roughly fitting the discription of appellant's accomplice standing beside it. Her friend memorized the license plate number, which they were later told was that of the Cantus' truck.

The deceased's sister testified that sometime after 10:30 p.m. she observed what she recognized from the oversized tires to be the Cantus' truck pass on the street behind her house, located near Greenwood Drive. In the passenger side of the Blazer she saw a black male, but she was unable to view the driver. Behind the Blazer, and, she "assumed," following it, was a blue fourdoor "Ford or ... Chevy" automobile

geant Lozano would soon find the body of the deceased, in a pool of blood on the side of the road, *sans* vital signs, only two or three feet removed from the still-idling Blazer.

Police recovered six .45 caliber casings in various locations around the scene of the killing. Three .45 caliber slugs were recovered at the scene as well. The deceased sustained five gunshot wounds; only one of these wounds, however, was identified as fatal.[5] Examination of the clothes of the deceased revealed at least five and as many as seven other shots penetrated his jacket and shirt without actually striking the body. During the autopsy an additional .45 caliber slug fell out of the shirt of the deceased. This last slug, however, was not associated with the fatal wound. A second slug, either a .357 or a .38 caliber, also identified with one of the nonfatal wounds, was found embedded under the skin of the deceased's back. One of the State's forensic experts, Max Courtney, testified that judging from the lead residue associated with the entry hole of the wound that did prove fatal, the size of that hole, and its similarity to the wound sustained by the slug shown to have been .357 or .38 caliber, he believed the fatal wound had also been caused by a .357 or .38 caliber, rather than a .45 caliber projectile. Courtney indicated some of the deceased's wounds, as well as perforations in the clothing of the deceased associated with nonwounding projectiles, were consistent with the theory that the killer was positioned "above the shoulder of the victim,"

and that he may have been "shooting down" on the deceased who was on hands and knees. Although he could not determine the order in which all of the wounds were sustained, Courtney did believe the fatal wound was "probably" inflicted last.

Several months after the instant offense was committed appellant was apprehended as he fled the scene of a robbery. During commission of the robbery appellant displayed a chrome plated .357 Magnum revolver which ballistics proved to be the same pistol that had wounded the deceased.[6]

To show motive on the part of appellant for killing the deceased, particularly in view of the fact that Elizabeth Cantu was not also murdered, the State presented testimony from the former wife of the deceased, Olga Cantu. She testified that she knew appellant because they had gone to high school together. In 1976, while married to the deceased, she worked in a store called the Maverick Mart. The deceased worked next door in an auto parts store, and frequented his wife's workplace. At least "[s]everal times" appellant and the deceased were in the Maverick Mart at the same time, and at least on one occasion Olga called out to appellant, "Hey, Freddie," in her husband's presence. The inference sought by the State, one we believe the jury would have been justified in drawing, is that once the kidnapping and robbery of the Cantus got underway, appellant recognized the deceased, realized the deceased might be able to identify him later, and therefore began to plot his demise.

which "looked like" a 1979 Ford LTD appellant's stepfather had sold him in May of 1985.

Sergeant Lozano of the Corpus Christi Police Department testified he observed what he believed at the time was a "green," late model Ford LTD at the intersection of Greenwood and Saratoga, coming from the direction in which he would momentarily discover the still quivering body of the deceased.

5. The autopsy and testimony of the medical examiner established the deceased was shot: 1) through the right bicep and into the chest, not penetrating the chest cavity; 2) in the left elbow, the bullet traveling down the forearm; 3) through the fleshy part of the left arm, again entering the chest but not chest cavity; 4) in the back, penetrating first the right lung, then the

heart, then the left lung—obviously a "rapidly incapacitating" wound, and the fatal one; and 5) in the right shoulder blade.

6. Appellant had an accomplice, Warren Clark, in the commission of this extraneous robbery. During their flight Clark also handled the revolver as appellant drove the getaway car. It was not shown that Clark had been the accomplice in the instant offense—in fact, that accomplice was never identified. Clark testified on behalf of appellant that he and appellant did not obtain the .357 Magnum until shortly before commission of the robbery, *after* the capital murder was committed. Especially in view of Cantu's testimony, see n. 2, *ante,* the jury was entitled to discount this evidence.

The jury charge authorized conviction of appellant either as a primary actor in or as a party to the capital murder.[7]

We hold the evidence, viewed in the light most favorable to the verdict, was ample to support appellant's conviction either as a primary actor or as a party to the intentional killing of the deceased. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). That the killing occurred in the course of kidnapping cannot reasonably be disputed. Clearly it was either appellant or his accomplice that actually caused the death of the deceased; the evidence, though circumstantial, is susceptible to no other rational interpretation. *Carlsen v. State*, 654 S.W.2d 444 (Tex.Cr. App.1983). Elizabeth Cantu's testimony placed the likely murder weapon in appellant's hand shortly before the shooting. Appellant exhibited the same weapon in the commission of another offense not long after the murder. Moreover, the evidence provides a motive for appellant personally to take an interest in disposing of the deceased, and it tends to show that as between appellant and his accomplice, appellant was giving the orders. On these facts a reasonable jury could readily have found appellant guilty either of intentionally causing the death of the deceased himself, or of soliciting, directing, encouraging or aiding his accomplice to do so.

Furthermore, whether it found appellant guilty as a primary actor or as a party, the jury was justified in its verdict that appellant "acted deliberately." Assuming it found appellant actually caused the death of the deceased, we examine whether the jury could rationally find his state of mind when he effected that result

amounted to a "conscious decision involving a thought process which embraces more than mere will to engage in the conduct." *Nichols v. State*, 754 S.W.2d 185, 201 (Tex.Cr.App.1988). From the forensic testimony the jury could reasonably have believed that, after both appellant and his accomplice inflicted a number of nonmortal wounds upon the person of the deceased in a virtual fusillade on the side of the road, appellant stood before his fallen victim and finished him off with the .357 Magnum. Such a scenario would support a finding appellant "acted deliberately" in that it reflects "a conscious decision—greater than mere will—to cause the death" of the deceased. *Id.*

Assuming, on the other hand, that the jury believed appellant acted as a party to the conduct of his accomplice, in assessing whether the evidence supports a finding he "acted deliberately," we look to appellant's own conduct by which he "solicited, encouraged, directed, aided or attempted to aid" perpetration of the intentional murder. *Meanes v. State*, 668 S.W. 2d 366 (Tex.Cr.App.1983).[8] It would not have been irrational for the jury to believe appellant's accomplice fired the fatal shot in this case. In any event the evidence shows conclusively that two guns were involved, a .45 caliber automatic and the .357 Magnum revolver. The jury could well have believed appellant, using the .45 caliber, participated in the fusillade that brought the deceased down. Though it seems less plausible, the jury might also have believed the accomplice first incapacitated the deceased with the .45 caliber, then killed him with the .357 when the clip ran out in the .45. Even under this theory,

---

7. Specifically, the jury was instructed it could convict appellant if it found that he:

    "acting with the intent to promote or assist in the commission of Capital Murder, solicited, encouraged, directed, aided or attempted to aid another person to intentionally cause the death of Leopoldo Cantu by shooting him with a firearm to wit a pistol while in the course of committing or attempting to commit the kidnapping of Leopoldo Cantu[.]"

    In another point of error appellant claims the trial court erred in so authorizing the jury. See *post*.

8. We have held, as a matter of statutory construction, that the law of parties does not apply at the punishment phase of a capital murder trial. *Green v. State*, 682 S.W.2d 271, 287 (Tex. Cr.App.1984), adopting the concurring opinion in *Meanes v. State*, supra; *Cuevas v. State*, 742 S.W.2d 331, 342 (Tex.Cr.App.1987). Thus, we may not focus upon the conduct of the primary actor in assessing a party's deliberateness. See also *Martinez v. State* (Tex.Cr.App., No. 69,303, delivered September 21, 1988) (Slip op. at 12, n. 5).

appellant had to supply his accomplice with the .357 revolver to complete the killing. Either scenario would support a jury finding that appellant's conduct, by which he solicited, encouraged, directed or aided the killing, was "committed deliberately and with the reasonable expectation that ... death ... would result."

We therefore reject appellant's points of error challenging sufficiency of the evidence.

In another related point of error appellant contends the jury's verdict on punishment was "fatally defective" in that the jury was allowed to assess the death penalty without first expressly finding he himself killed, attempted to kill, intended to kill or contemplated that lethal force would be employed. *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). He argues that since it is impossible to tell whether the jury believed he was the triggerman, it "left unanswered the question of whether he intended that the deceased be killed or anticipated that lethal force would or might be used if necessary to effectuate the robbery and a safe escape." He maintains *Enmund* has therefore been violated.

If we understand him correctly, appellant thus argues that because he could have been convicted as a party to the capital murder, the finding required by *Enmund* may not have been made. Our response is twofold.

First, appellant's argument must be rejected in keeping with this Court's holding in *Cuevas v. State*, 742 S.W.2d 331 (Tex.Cr. App.1987). There we reprised our holding in *Green v. State*, 682 S.W.2d 271 (Tex.Cr. App.1984), that as a matter of statutory construction the law of parties may not be applied at the punishment phase of trial. The Court went on to observe:

> "Of course, application of the law of parties at the guilt phase means it is possible for a non-triggerman, such as [the defendant], to be convicted of a capital offense. However, a capital defendant will be assessed the death penalty only if the jury answers the special issues of Art. 37.071(b) in the affirmative. Special issue number one requires the jury to determine 'whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result.' Because the law of parties may not be applied in answering this issue, an affirmative verdict is possible only when the jury finds that the defendant's *own* conduct satisfies both parts of special issue number one. *Therefore, the first special issue of Art. 37.071(b) includes the Enmund and Tison [v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987)] findings.* The Supreme Court opinions in *Enmund* [*Cabana v.*] *Bullock*[, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986)] and *Tison* have placed no additional burden on the Texas capital sentencing scheme."

742 S.W.2d at 343. Having already concluded the evidence supported the jury's affirmative answer to special issue one, we may further conclude, by authority of *Cuevas*, supra, that the dictates of *Enmund* have been met.

Secondly, in our view the jury made an adequate finding of an intent to kill in its verdict of guilt, regardless of whether it found appellant guilty as primary actor or as a party to the offense. In a prosecution for capital murder under V.T.C.A. Penal Code, § 19.03(a)(2), in order to convict the accused as a primary actor the State must prove and the jury must find that he "intentionally commit[ted] the murder" in the course of the underlying felony. Unquestionably such a finding satisfies *Enmund*. Moreover, before the accused may be found criminally responsible for the conduct of another who "intentionally commits the murder," under the provisions of V.T.C.A. Penal Code, § 7.02(a)(2), it must be shown the accused harbored a specific "intent to promote or assist the commission of" the intentional murder the other committed. *Meanes v. State*, supra at 375–76; *Rector v. State*, 738 S.W.2d 235, 244 (Tex. Cr.App.1986); See also *Martinez v. State* (Tex.Cr.App., No. 69,303, delivered September 21, 1988) (Slip op. at 12, n. 5).

One could hardly indulge an intent to promote or assist in the commission of an intentional murder without, at a minimum, intending or contemplating that lethal force would be used. In short, that the jury may not have believed appellant pulled the trigger of the actual murder weapon is of no moment. Because it was required to find an intent to promote or assist commission of *an intentional murder* before the jury could convict appellant as a party to the offense in the first instance, we cannot say its later punishment verdict was "fatally defective" under *Enmund.* Thus we overrule this point of error.

■■■ By his third point of error appellant assails the trial court for "permitting proof of an impermissable [sic] and improper pretrial identification." In point of fact it was appellant himself who first elicited testimony at trial as to the identification procedure he now challenges as impermissibly suggestive, and hence violative of due process, when he took Elizabeth Cantu on crossexamination. Though obviously he elicited this testimony in an effort to convince the jury it should give Cantu's *incourt* identification no weight, he cannot be heard to complain specifically of admission of that evidence now. See *Thompson v. State,* 480 S.W.2d 624, 627 (Tex.Cr.App. 1972). In the interest of justice, however, we will treat appellant's point of error as a complaint that the trial court erroneously allowed Cantu to identify appellant before the jury during her direct examination because her incourt identification had been tainted by an impermissibly suggestive pretrial identification procedure.

■■■ A pretrial identification procedure may be so unnecessarily suggestive and conducive to mistaken identification that to use that identification at trial would deny the accused due process of law. *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). However, it is the "substantial likelihood of misidentification" that may be engendered by such suggestive procedure that works the deprivation. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Neil*

*v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Thus, if the totality of the circumstances reveals no substantial likelihood of misidentification despite a suggestive pretrial procedure, subsequent identification testimony will be deemed "reliable," "reliability [being] the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

To be weighed against the corrupting effect of any suggestive identification procedure in assessing reliability under the totality of the circumstances are the following nonexclusive factors: "The opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Id,* 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154.

■■■ Of course, a finding that a challenged pretrial identification procedure was not in fact impermissibly suggestive will obviate the need to assay whether under the circumstances it created a substantial likelihood of misidentification. *Williams v. State,* 675 S.W.2d 754, 757 (Tex.Cr.App. 1984).

Appellant filed a pretrial motion requesting the trial court to conduct a *"Martinez"* hearing,[9] to determine whether "any incourt identification by any witness" may have occurred under unduly suggestive circumstances. It was established at the hearing that on two occasions shortly after the offense was committed Cantu viewed photographic lineups, three on December 9, 1985, and a fourth on December 15, 1985. Each lineup consisted of six pictures of black males. Appellant's photograph was not among any of the four lineups. Cantu made no identification. On January 13, 1986, Cantu was shown over two hundred photographs of known black offenders, some in the form of lineups prepared for various other cases, and others just

9. *Martinez v. State,* 437 S.W.2d 842 (Tex.Cr.App. 1969).

"loose." Police had no suspects at this time and no suggestions were made to Cantu as to whom she should pick out. Again, appellant's photograph was not among those she viewed; again, she identified nobody.[10]

The live lineup appellant now challenges occurred on May 1, 1986, one week shy of five months after commission of the offense. To this point Cantu had never seen a photograph of appellant, who appeared as the "No. 2" man in the lineup. It was not suggested to Cantu that she "pay special attention to No. 2," or that "she had to pick out one of the people[.]" One of appellant's trial counsel was present and the makeup of the lineup met his approval. Before viewing the lineup Cantu was told not to say anything afterwards, but to indicate on a form which of the members of the lineup she could identify, if any. This she did, making an "X" on the form in the position corresponding to appellant. When asked, "[s]he said yes, that was the person she had seen."

Both the officer who conducted the May 1 lineup and Cantu herself testified that prior to viewing the lineup, Cantu learned that police had apprehended a man in possession of the pistol that had killed her husband.[11] She was not told the name of the suspect, but she seems to have been informed that he would appear in the lineup.[12] Her testimony proceeded as follows:

"Q. Okay. Now when you looked at that lineup, you recognized one person?
A. After seeing them all because I remember the side profile.

Q. Okay, did you recognize one?
A. Yes, I did.
Q. And that was person No. 2?
A. Yes.
Q. Now did you pick him out of the lineup because he was the shortest person or the lightest person that was in the lineup; is that why you picked him out?
A. No, I did not.
Q. Why did you pick him out?
A. Because that was him.

\* \* \* \* \* \*

Q. When you looked at that lineup, did you feel that you had to pick out one person?
A. They didn't tell me I had to pick out someone. They just told me to look at them.
Q. Okay. Well, when you picked out No. 2, did you pick him out because you truly recognized him?
A. Yes.
Q. Did you pick him out just because you said: Well, I've got to pick out somebody and he looks the most like him?
A. No, I picked him out—
Q. Why?
A. —Because I recognized him.
Q. Is there any question in your mind that the person you picked out, No. 2, was the person involved in the robbery?
A. He was definitely involved.

\* \* \* \* \* \*

10. On this occasion Cantu had remarked of the individuals in the photographs that "they all looked alike." She was allowed to explain:
"Q. Okay, when you made that statement, did you say they all looked alike because you couldn't distinguish one person from another or were you making a statement they looked similar, but they are not the person who robbed you?
A. I was just making a statement. I didn't really actually mean that.
Q. Okay, let me ask you whether you were making a statement one of two ways. Were you making a statement that they looked alike and you'd never be able to tell them apart or that they looked similar, but they weren't the person who robbed you?
A. They look similar."

11. Cantu testified that officer Eddie Garza provided this information the day before the lineup. Garza denied this.

12. Cantu testified she was "sure [she] knew that the person in there had the gun" that killed her husband. The record is ambiguous as to what "in there" refers to. Garza testified he thought that "[s]he knew the pistol had been found on one of these people in the lineup[.]" No one told Cantu positively that "the man that killed your husband" would be in the lineup. On recrossexamination she ultimately acknowledged, however, that she had been told the lineup would include the man police had recently come to suspect.

Q. Did you feel when you looked at the lineup, the live lineup, that you had to pick somebody out?

A. I know I didn't have to pick anyone out.

\* \* \* \* \* \*

Q. Now after looking at the lineup and making your X in block No. 2, do you recall whether or not you made a statement that you picked No. 2 because he was the only one it could be because the others were too tall and too dark?

A. I said the others were out of the question.

Q. Okay, what did you mean by that statement, the others were out of the question?

A. Because I picked him out. The other ones, they couldn't have been him.

Q. Okay.

A. Because they just weren't it, their side profile, just me remembering them."

On crossexamination appellant's counsel attempted to have Cantu admit she positively identified appellant for the sole reason that of all the participants in the lineup, which she knew to include a suspect, appellant most closely matched the description of her assailant as she remembered him. Thus:

"Q. And so you went in that lineup in your own mind knowing you had to pick one of those people?

A. It was on my mind, yes.

\* \* \* \* \* \*

Q. Do you recall what you told me [at the time of the lineup]?

A. Not exactly. The only thing I remember telling you was all the other ones were just out of the question.

Q. Do you recall saying they're all too tall to be considered and too dark?

A. They were too dark definitely.

Q. And they are all too tall and too dark, except No. 2, isn't that what you told me?

A. That's why I said the other ones are all too dark because I distinctly remember that he was not dark.

Q. So they had one light fellow in this bunch, short fellow with a bunch of tall fellows, did they not?

A. Right, their hair was just not right.

Q. There wasn't any choice for you to make if you knew that man was in that lineup that had that gun, it had to be the light one?

A. No, I was looking at—

Q. But the other ones weren't even considered?

A. The other ones—

Q. Because they were all too dark?

A. There was one about his size.

Q. I understand. You could only consider one because he was short and light. The other ones were too tall or too dark, is that correct, Mrs. Cantu?

A. Right."

Taking her on redirect, the prosecutor asked:

"Q. Now when you went in and looked at this lineup, did you look very carefully at all of the people?

A. Yes, I did. I said he was too think [sic], his hair was not right, he was definitely too dark, his color is too dark and he was definitely out of the question, too short.

Q. What did you say when you looked at No. 2?

A. That I looked at him closely and that's him.

Q. Did you feel that he must be the one because of all these other things or did you look at him and say that's the man because you recognized him?

A. I recognized him when he turned to the side.

Q. Turned to the side?

A. Because, like I said, I remember side profiles, his hands.

Q. Is there any question in your mind that that's the individual?

A. That's him."

Finally, after getting Cantu to admit she had known the suspect was in the lineup, defense counsel elicited the following:

"Q. And you knew in your own mind and heart if that man was in there, he had to be the light, short man. You eliminated all the others, didn't you?

A. Um-hum.

"Q. You took one look at them and said: None of these can be the man except that short, light one because they're all too dark or too tall, is that correct?

A. No, there was some that looked in there; they weren't all that short.

Q. Is that correct?

A. Yes, sir.

Q. That you said that's got to be the man if they have the man that shot my husband because they're all too tall or too dark?

A. I looked at them thoroughly before I picked him.

Q. And you eliminated all the others because they were all too dark or too tall?

A. Um-hum."

The trial court then entertained brief arguments on whether "the lineup should be suppressed." Appellant argued Cantu had been primed to identify any short, light-complected black male in the lineup. The State replied that "she remembered him from the night of the offense especially when he turned so that she could see his profile." Furthermore, "[i]f she was just going to identify someone because they were light, then she could have identified anybody out of over two hundred photographs, but she did not." The trial court denied the motion, commenting: "I do find that there is—was some suggestiveness to the mind because of the fact that she knew the gun had been found, but that it was not impermissibly suggestive."

Thus the trial court ruled, in effect, that although the lineup had contained an element of suggestiveness, it had not been "so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253. It is undoubtedly the case that in a substantial number of live lineups the identification witness will presuppose that police have some reason to believe one of the participants is the perpetrator. Were this fact alone sufficient to render the lineup impermissibly suggestive, however, precious few lineups would meet constitutional muster. Here, what Cantu probably suspected already was confirmed —that police believed someone in the lineup was her assailant. She may even have known he was found with the murder weapon. Still, she was not overtly pressured to make an identification. We have seen a xerox copy of a photograph of the lineup and observe nothing intrinsically suggestive about its makeup. Cantu's testimony supports the conclusion that she in fact identified appellant not simply by a process of elimination, because he was the shortest and lightest-skinned, but because, as the prosecutor argued, she was able positively to remember his profile. Having viewed and rejected literally hundreds of photographs, she had shown no propensity for misidentification. Thus, the trial court would have been justified in finding Cantu's identification of appellant occurred independently of whatever suggestiveness it found inherent in the procedure. The testimony adduced at the pretrial hearing fails to establish that the trial court abused its discretion in permitting the incourt identification. See *Spencer v. State*, 466 S.W.2d 749 (Tex.Cr.App.1971).

Furthermore, evidence adduced at the trial on the merits fortifies the trial court's earlier ruling.[13] During her crossexamination Cantu admitted before the jury that she had known a suspect was in the lineup.

13. In *Hardesty v. State*, 667 S.W.2d 130, at 133, n. 6 (Tex.Cr.App.1984), we observed that "where the ground of error complains of the admission of evidence at trial, and the issue has been consensually relitigated by the parties during the trial on the merits, consideration of relevant trial testimony is appropriate." It is true appellant "relitigated" facts surrounding the pretrial identification procedure only in context of trying to impugn the weight the jury should accord Cantu's identification of appellant at trial, and was not attempting specifically to retry the legal question of its admissibility, *vel non*, as a function of due process analysis. To hold that appellate review is limited to facts adduced at the pretrial hearing under circumstances such as these, however, could place the appellate court in the untenable position of having to reverse a conviction in the face of a record which supports, albeit belatedly, the trial court's ruling. In scrutinizing trial determinations of admissibility of identification testimony, this Court has not so limited its review. See, e.g., *Jackson v. State*, 657 S.W.2d 123 (Tex.Cr.App.1983).

She maintained, however, that she had been mistaken at the pretrial hearing in her testimony that at the time she viewed the lineup she knew that the suspect had been apprehended in possession of the murder weapon. She also testified that altogether she had spent "[a]bout twenty minutes" in the presence of her assailant, and that the illumination in the office of the Ship Ahoy had been better than that in the courtroom. While she had spent part of those twenty minutes on the floor behind the desk, unable to observe her assailant, she was able to see him "when [she] was trying to open up the safe, when [she] turned around and looked at him." Her identification of appellant at trial was positive.

On the basis of this evidence the trial court could readily have found that at least three of the five factors specifically enumerated in *Neil v. Biggers,* supra, militate in favor of the conclusion that no substantial likelihood of misidentification could have resulted from the instant lineup. Cantu's opportunity to view her assailant was at least adequate. Although she did not observe him for the entire twenty minutes of her ordeal, her attention was unquestionably focused upon him from the start. She was able to identify him unequivocally and without hesitation at the lineup itself, and again during the pretrial hearing and at trial; this could be attributed primarily to her memory of his profile. Appellant stresses that five months passed between offense and lineup; yet, in *Neil* itself a period of seven months elapsed. Nevertheless, in view of its assessment of the other factors, the Supreme Court there found no substantial likelihood of misidentification. Measured against the suggestiveness of the particular lineup in issue here, these circumstances are sufficient to support the trial court's conclusion that admis-

sion of Cantu's identification testimony would not violate due process of law, and accordingly we hold it was not error to have admitted it. This point of error is overruled.

■■■ Appellant contends in his first point of error that the trial court erred in failing to grant his pretrial motion to suppress the .357 Magnum revolver, which he argues was seized as a result of his illegal arrest. In essence appellant maintains the officers who arrested him following the robbery of a convenience store clerk in George West, Live Oak County, had neither the constitutionally required probable cause, nor its statutory "legal equivalent," *Earley v. State,* 635 S.W.2d 528, 531 (Tex. Cr.App.1982), *viz:* "satisfactory proof," under Article 14.04, V.A.C.C.P., to do so. We disagree.

Between 8:00 and 8:10 p.m. on the evening of March 29, 1986, according to testimony at the pretrial suppression hearing, Department of Public Safety Trooper Lambert Cantu was patrolling along Interstate Highway 37 outside of Mathis, in San Patricio County, when he received a radio broadcast from neighboring Live Oak County's Sheriff's Department that an armed robbery involving two black males had just taken place in George West. Approximately fifteen minutes later Trooper Cantu was flagged down by a passing motorist, Octaviano Perez. In a state of excitement Perez informed Cantu that he had been following two black males driving a Marquis, that these males had just committed a robbery at the Tad's Food and Fuel store in George West,[14] and that they were in possession of either a .357 or .38 Magnum chrome-plated pistol. The testimony conflicts as to whether Perez was able to tell Cantu the color of the Marquis, but he did tell Cantu that five cars had passed since Perez

---

14. Perez had been standing in the parking lot of Tad's Food and Fuel when an employee whom he knew, Michael Carvajal, rushed out of the store and approached him. Carvajal informed Perez that a robbery had occurred and, indicating a car parked further down the road, exclaimed, "They are the ones that robbed us." At Carvajal's request, Perez jumped into his pickup and began to pursue the car at a high rate of speed. The chase lasted for approximately twenty minutes, during which Perez managed to scribble the license plate number on the ceiling of his truck. At one point the passenger, Clark, pointed what Perez recognized to be "either a .357 Magnum chrome-plated or a .38" pistol at him, and Perez was momentarily forced off the road. Shortly thereafter Perez spotted Trooper Cantu. None of these specific facts were communicated to Cantu.

stopped to contact the trooper, so that the Marquis would be the sixth car ahead. He further supplied the license plate number.

As he gave pursuit, Trooper Cantu broadcast the information Perez had given him. This was intercepted by San Patricio County Deputy Sheriff Glenn Standley, who had earlier monitored a Live Oak County broadcast describing the suspect vehicle as a yellow or tan Marquis. Standley and his partner joined the pursuit, and within minutes they and Trooper Cantu stopped the Marquis and secured its occupants, appellant and Warren Clark. The chrome-plated .357 Magnum was discovered in plain view, cocked, on the front seat. This weapon proved to have been one of the pistols used to murder the deceased two months before.

Both probable cause and "satisfactory proof" to arrest are present:

> "where, at that moment, the facts and circumstances within the knowledge of the arresting officer and of which he has reasonably trustworthy information would warrant a reasonable and prudent man in believing that a particular person has committed or is committing a crime. [citations omitted.]"

*Earley v. State*, supra at 531, quoting *Brown v. State*, 481 S.W.2d 106, 110 (Tex. Cr.App.1972). In assessing whether he has probable cause to arrest:

> "an officer may certainly consider information furnished by a private citizen 'whose only contact with the police or criminal activity is a result of having witnessed a single criminal act committed by another,' *Frazier v. State*, 480 S.W.2d 375, 379 (Tex.Cr.App.1972), [but] he should have some indicia that the citizen is worthy of belief, *Honeycutt v. State*, [499 S.W.2d 662], at 665, n. 3

[ (Tex.Cr.App.1973) ], and his information reliable before acting on his report."
*Earley v. State*, supra at 532.

Certainly the information Perez supplied to Cantu, that an armed robbery had occurred at Tad's Food and Fuel and that the robbers were fleeing in a specified car, was sufficient to warrant a prudent man in believing the occupants of that car had committed a felony. The remaining question is whether a reasonable man would credit Perez' information under the circumstances. Relevant to this determination are the factors we identified in *Earley*, supra, *viz:* whether Cantu had some indicia Perez was worthy of belief and that his information was reliable. *Eisenhauer v. State*, 754 S.W.2d 159 (Tex.Cr.App.1988).[15] We hold Cantu was justified in acting upon Perez' representations.

■ Although there is no indication Perez gave Cantu his name,[16] he was obviously a citizen informant willing and eager to deliver his information face to face. Though he knew of the fact of the robbery itself only from what he had been told by another citizen, see n. 14, *ante*, certainly Perez' story was sufficiently detailed as to suggest to Cantu direct knowledge on his part. For these reasons it was not unreasonable for Cantu to afford Perez at least a modicum of trust. See *Esco v. State*, 668 S.W.2d 358, 361 (Tex.Cr.App.1982) (Opinion on original submission), and cases cited therein. Furthermore, the information supplied by Perez dovetailed nicely with information already within the collective knowledge of Officers Cantu and Standley from various broadcasts emanating from the Live Oak County Sheriff's Department —that two black males had been involved in an armed robbery in George West and would be driving a Marquis. It is true that the factual origin of these broadcasts was

---

**15.** In *Eisenhauer* the Court adopted the federal "totality of the circumstances" "methodology" as the proper appellate measure of probable cause for, *inter alia,* warrantless arrests under Art. I, § 9 of the Texas Constitution and Chapter 18, V.A.C.C.P. But see this writer's dissenting opinions there and in *Brown v. State*, 657 S.W.2d 797 (Tex.Cr.App.1983) and *Whaley v. State*, 686 S.W.2d 950 (Tex.Cr.App.1985).

**16.** The pretrial did not disclose whether Trooper Cantu may already have known Perez. However, Perez testified he knew several Highway Patrolmen, and had seen Cantu before, but could not remember his name.

not established at the pretrial hearing.[17] Nevertheless, we believe that the very fact of the confluence of this information from such divergent sources, at least one of which carried some inherent indicia of reliability, would justify a reasonable and prudent man in concluding it was sufficiently trustworthy to act upon. The Live Oak broadcasts, while plainly insufficient to provide probable cause in themselves, nevertheless sufficiently reduced the chance that Perez' was a "reckless or prevaricating tale" as to provide a substantial basis for crediting his hearsay. *Angulo v. State,* 727 S.W.2d 276, 280 (Tex.Cr.App. 1987). We therefore conclude that appellant's warrantless arrest was nonetheless legal. Accordingly, this point of error is also overruled.

In his sixth point of error appellant maintains the trial court erred in failing to sustain his objection to the inclusion in the court's charge at the guilt phase of an instruction authorizing the jury to convict appellant as a party under V.T.C.A. Penal Code, § 7.02(a)(2). Appellant simply argues that no evidence supported the charge, without further amplification. As our discussion of appellant's sufficiency grounds *ante* should make clear, we disagree. Consequently, we overrule this point of error.

In related points of error appellant complains of the admission of the somewhat extensive testimony going to establish the robbery at Tad's Food and Fuel, and of the failure of the trial court to give a limiting instruction to the jury relative to that testimony. Although he filed a motion in limine to exclude this testimony, which was denied, appellant neither objected to admission of any of the testimony, nor requested a limiting instruction of any kind, and thus he has failed to preserve error, if any. It is "axiomatic" that motions in limine do not preserve error. *Maynard v. State,* 685 S.W.2d 60, 64 (Tex.Cr.App.1985); *Romo v. State,* 577 S.W.2d 251, 252 (Tex. Cr.App.1979). Furthermore, the party opposing admission of evidence has the burden, where the evidence is offered and admitted for a limited purpose, of requesting a correct limiting instruction. *Plante v. State,* 692 S.W.2d 487, 493 (Tex.Cr.App. 1985), and authorities cited therein. The Court has declined to hold on prior occasions that failure to give such an instruction constitutes fundamental error. See, e.g., *Cyrus v. State,* 500 S.W.2d 656 (Tex. Cr.App.1973). Appellant does not venture to argue, nor will we therefore address, whether failure by the trial court to give an instruction *sua sponte* amounted to fundamental error under *Almanza v. State,* 686 S.W.2d 157 (Tex.Cr.App.1984), on the facts of this case.[18] These points are overruled.

---

17. The test of probable cause for a warrantless arrest by an officer on the strength of a request by other law enforcement authorities is the information known to the requesting authorities. E.g., *Hooper v. State,* 516 S.W.2d 941, 944 (Tex. Cr.App.1974).

At trial other facts were elicited without objection by appellant relevant to the Live Oak County broadcasts. See n. 13, *ante.* Immediately after the robbery "Tad" Waldron called the sheriff's dispatcher to report it, and the initial broadcast went out. The County Sheriff, Larry Busby, proceeded to Tad's Food and Fuel shortly afterwards to interview the victims, Waldron and Carvajal. After hearing about the robbery on his radio, James Youngman, a reserve deputy, soon arrived to report that at about the time of the offense he had observed a suspicious vehicle, a yellow Mercury Marquis, parked in an odd place across the road from the store. Presumably this was the basis for the broadcast Standley heard, although no one expressly testified so.

18. In the same points of error appellant contends, again without further elaboration, that if error is not preserved, then he has been rendered ineffective assistance of counsel. He makes no attempt to show "a reasonable probability that ... the result of the [trial] would have been different" had his counsel timely objected to admission of the testimony concerning the robbery. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hernandez v. State,* 726 S.W.2d 53 (Tex.Cr.App. 1986). This omission alone is fatal to his contention. Furthermore, to show likelihood of a different outcome appellant would have to show an objection would have been well taken. Though it fits snugly into none of the so-called "exceptions" to the general rule of inadmissibility of extraneous transactions, *Albrecht v. State,* 486 S.W.2d 97 (Tex.Cr.App.1972), the robbery at Tad's Food and Fuel may well have been admissible to show subsequent possession and use by appellant of one of the weapons used to gun down the deceased. In view of the circumstantial nature of the evidence of the actual killing,

█ In his final two points of error appellant challenges admissibility of a cassette tape recording documenting Elizabeth Cantu's initial call to the police, subsequent dialogue between dispatchers and police officers and between officers and other officers as events unfolded, and further conversation between a dispatcher and Cantu as she waited for someone to come unlock the doors to the Ship Ahoy and release her. Appellant claims that two of the seven prongs for establishing admissibility of tape recorded evidence under *Edwards v. State*, 551 S.W.2d 731 (Tex.Cr.App.1977) are lacking, *viz:* "establishment of the authenticity and correctness of the recording," and "a showing that changes, additions, or deletions have not been made[.]" *Id,* at 733. He also contends that at any rate the tape recording was inadmissible because it was "cumulative, prejudicial, and therefore harmful" to his cause.

Captain Wallace Crisp testified that at the time the recording was made he was in charge of the communications division of the Corpus Christi Police Department. According to Crisp, incoming calls to the police department were recorded on two six-foot-tall reel-to-reel tape recorders with reels of ten and a half inches in diameter. Each was a thirty channel recorder, meaning it was capable of recording various conversations which occur simultaneously. As he had done "quite often" in past cases, upon request Crisp re-recorded the radio and telephone transmissions pertaining to the robbery of the Cantus and the killing of the deceased onto a smaller cassette recorder. Crisp testified that the cassette tape contained no changes, additions or deletions since he made it. The cassette was offered and admitted into evidence.

Appellant complains that the cassette recording is not an exact duplicate of the actual reel-to-reel tape made of the incoming calls. Crisp was required to sort through the various channels on the original tape and, using his experience and his knowledge of police terminology, to discern which conversations related to the instant offense and which did not. Naturally, he also found it necessary to render many simultaneous dialogues sequential on the cassette recording. These circumstances, though not "accidental"—we view them, rather, as ineluctable—were not such as necessarily to affect the reliability of the recording. See *Quinones v. State*, 592 S.W.2d 933, 942 (Tex.Cr.App.1980). We cannot say the trial court abused its discretion on this account in admitting the cassette tape.

█ Nor will we second guess the trial court's determination that the tape was not needlessly cumulative or more prejudicial than probative. We have read the court reporter's transcription of the cassette tape,[19] and while it did not of itself establish any material fact not otherwise proven in the balance of the State's case, it did provide a framework within which the particulars of the State's evidence could be developed. Appellant fails to specify in what respect he believes the tape was prejudicial. Nor do its contents appear to us especially inflammatory. Again, we cannot fault the trial court for admitting it. These points are overruled.

---

which appellant himself repeatedly assails in this appeal, the need on the part of the State to connect the appellant personally to the probable murder weapon was certainly substantial. Therefore, admission of the extraneous robbery appears more probative than prejudicial, see *Morgan v. State,* 692 S.W.2d 877, 879–80, nn. 3 & 4 (Tex.Cr.App.1985), and, reaching the merits of appellant's contention, we would likely defer to the trial court's decision to admit it.

19. Although admitted into evidence, the cassette tape itself was not forwarded to this Court, but remains in the district clerk's office. We therefore have been unable to listen to it. Although he requested a "complete transcription" of the

trial proceedings, appellant did not specifically include exhibits from trial as part of his designation of record on appeal, which was filed November 3, 1986. See Tex.R.App.Pro. Rules 50(b), 53(a). Unlike former Article 40.09, § 1, V.A.C.C.P., Tex.R.App.Pro. Rule 51(a) does not expressly make inclusion of exhibits in the appellate record mandatory. The burden is on the appellant here to see that a sufficient record is presented to show error requiring reversal. Tex.R.App.Pro. Rule 50(d). If appellant believed actually listening to the tape would have made a difference in our assessment of prejudice, it was incumbent upon him to ensure that it was contained in the record.

The judgment of the trial court is affirmed.

TEAGUE, J., dissents.

MILLER, J., not participating.