Opinion issued May 28, 2009




 










In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-08-00126-CR

____________


TIMOTHY HEARNE, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 337th District Court

Harris County, Texas

Trial Court Cause No. 1149907





 

MEMORANDUM OPINION

 Appellant, Timothy Hearne, appeals a judgment that convicts him for the
capital murder of "D" Pittman. See Tex. Penal Code Ann. § 19.03 (Vernon Supp.
2008). Appellant pleaded not guilty to the jury. The jury found him guilty, and,
because the State did not seek the death penalty, punishment was automatically
assessed at life imprisonment. Id. §§ 19.02(b)(1) (Vernon 2003), 19.03(a)(8)
(Vernon Supp. 2008). In two issues, appellant challenges the identification testimony
and the trial court's refusal to instruct the jury on the lesser included offense of felony
murder. We conclude the trial court did not err by admitting the identification
testimony and by refusing the lesser-included-offense instruction. We affirm.Background

 On the evening of October 3, 2004, complainant was at Pappadeaux's
restaurant in Houston. After spending some time at the bar, he exited the building
with Kiara Rainey to walk her to her car. Rainey's friend, Mildred Gaines, had left
the restaurant a few minutes earlier and was sitting in her car in the parking lot near
Rainey's car. As Rainey and complainant approached Rainey's car, Rainey and
Gaines each saw someone slowly walk toward complainant while pointing a gun at
complainant. Appellant then chased complainant toward the middle of the parking
lot. Complainant fell to the ground, then appellant put a gun to complainant's head
and the two started to "tussle." At this point, Rainey and Gaines each drove away. 
They each heard a gun being fired as they drove past the front door of the restaurant. 
The events that occurred outside the restaurant were seen by Tania Galamison, a
waitress who was inside the restaurant. 

 Officer Trevino, who was working at the restaurant that evening, was told by
the manager that someone was being held at gunpoint outside. As he came outside,
Officer Trevino saw appellant crouching over complainant, patting complainant's
pockets and muttering, "Where's the money, man?" Officer Trevino attempted to
tackle appellant, causing appellant to drop his gun. Appellant fled and Officer
Trevino chased him, but never caught him. Officer Speech, who was working at the
building next door, saw appellant was running away from Officer Trevino, but was
unable to catch appellant. Sergeant Baimbridge arranged for Gaines to meet with a
sketch artist to develop a drawing of the suspect.

 After escaping capture on the night of the shooting, appellant spoke to one of
his friends about the shooting. The day after the shooting, appellant told his friend,
Carey Lee Corley, that he shot complainant because complainant tried to reach for
appellant's gun. 

 Approximately two years later, Officer Schmidt received a tip that appellant
committed this shooting. A month later, Officer Schmidt prepared a photo array
using a photo of appellant. Officer Schmidt took the photo array to Gaines, telling
her that she was not required to pick anyone and that the person may or may not be
in the photo array.

 After Gaines positively identified appellant from the photo array, an arrest
warrant was issued and appellant was soon taken into custody. Gaines again
identified appellant at a live line-up. She was again given the standard
admonishment, after which she immediately stated she was positive in her
identification of appellant. At trial before the jury, Gaines again identified appellant
in court as the shooter.

Identification Evidence

 In his first issue, appellant contends that the trial court committed reversible
error by failing to grant his motion to suppress Gaines's in-court identification of
appellant because the identification was tainted by the prior photo spread and live
line-up of appellant.

 A. Standard of Review

 The standard of review on a claim that an in-court identification should not
have been admitted due to the taint of an impermissibly suggestive pre-trial
identification procedure is set forth in Loserth v. State, 963 S.W.2d 770 (Tex. Crim.
App. 1998). The standard of review depends upon the type of question presented to
the reviewing court. Loserth, 963 S.W.2d at 772. First, as a general rule, we must
give almost total deference to a trial court's determination of historical facts
supported by the record, especially when the trial court's fact findings are based on
an evaluation of the credibility and demeanor of the witnesses. Id. Second, we give
the same amount of deference to the trial court's rulings on "application of law to fact
questions," also known as "mixed questions of law and fact," if the resolution of
those questions turns on an evaluation of credibility and demeanor. Id. Finally, we
review de novo "mixed questions of law and fact" that do not turn on an evaluation
of credibility and demeanor. Id. In this case, the question of whether an
identification procedure was so impermissibly suggestive as to give rise to a very
substantial likelihood of misidentification is a mixed question of law and fact that
does not turn on an evaluation of credibility and demeanor. Id. at 773. Accordingly,
we apply a de novo standard of review. See id.

 When faced with a challenge to an out-of-court identification, a trial court must
look to the totality of the circumstances surrounding the identification to determine
if a procedure was so unnecessarily suggestive and conducive to irreparable mistaken
identification that the defendant was denied due process of law. Webb v. State, 760
S.W.2d 263, 272 (Tex. Crim. App. 1988). In the first step in this analysis, the trial
court determines whether the identification procedure was impermissibly suggestive. 
Barley v. State, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995). If the trial court
determines the identification is impermissibly suggestive, the court must then
consider the factors enumerated in Neil v. Biggers to determine whether the
suggestive procedure gave rise to a substantial likelihood of irreparable
misidentification. 409 U.S. 188, 199-200, 93 S. Ct. 375, 382 (1972). 

 B. Impermissibly Suggestive Identification

 We begin by examining whether the procedure used to obtain Gaines'
identification was impermissibly suggestive. A pre-trial procedure may be
suggestive, but that does not necessarily mean it is impermissibly so. Barley, 906
S.W.2d at 34. Suggestiveness may be created by the manner in which the pre-trial
identification procedure is conducted. Id. at 33. For example, police may point out
the suspect or suggest that a suspect is included in the line-up or photo array. Id. The
content of the line-up itself may show suggestiveness if the suspect is the only
individual who closely resembles the pre-procedure description. Id. Furthermore, an
individual procedure may be suggestive or the cumulative effect of procedures may
be suggestive. Id.

 Appellant contends that the procedure used to identify him was impermissibly
suggestive for two reasons. First, appellant asserts the officers' comments to Gaines
that she could cover up the facial hair in the photos was impermissibly suggestive. 
Second, appellant asserts the officers' comments about the height of appellant were
impermissibly suggestive. 

 The record shows that, upon seeing the photo array, Gaines quickly gravitated
to appellant's photo, remarking specifically that his eyes were memorable to her. 
According to Officer Schmidt, Gaines displayed a high degree of confidence in her
identification, although she noted that the hairstyle and facial hair on the photo were
different from the way the shooter looked. At the pretrial hearing, Graves testified
as follows:

 [State]: Can you tell the Judge what you saw when you looked at
the pictures?


 [Gaines]: I saw the man that I believed to be the shooter.


 [State]: And did you indicate that to the officers?


 [Gaines]: Yes. . . .


 [State]: All right. Did you say anything to the investigators about
the facial hair of the person in that picture [the one she had
identified]?


 [Gaines]: That he didn't -- I didn't believe he had the facial hair.


 [State]: What did the officers suggest that you do as you were
looking at that picture, do you remember?


 [Gaines]: Just to cover that part up.


 [State]: When you did that, were you even more convinced in your
own mind that you were making the right choice?


 [Gaines]: Yes. . . . 


 [State]: Do you remember telling me at one point that you asked
the investigator how tall this person was?


 [Gaines]: Yes, I did. . . 


 [State]: Tell the Judge about that.


 [Gaines]: He was the same height as the detective that came to my
home . . . .


 [State]: And do you recall him telling you that the person in No. 3
was around five-seven?


 [Gaines]: Yes.


 [State]: When they told you that the person was five-seven, in your
mind did you tell them that if he was that tall, then you
were a hundred percent sure?


 [Gaines]: Yes.


 [State]: At that point did you sign the picture?


 [Gaines]: Yes.


 [State]: Now, did they just tell you the height of this person, or did
you ask for it?


 [Gaines]: I asked.


 [State]: Did they tell you anything more than what we just talked
about, about this person?


 [Gaines]: No.


 During cross-examination, Gaines elaborated on her question about height:

 [Defense]: And then did you say that you were confident it was No.
3's face, but you were not 100 percent positive because you
could not tell the height in any of the pictures; is that
correct?


 [Gaines]: Correct.


 [Defense]: And it was then that you asked what was the height of that
person.


 [Gaines]: Correct.


 [Defense]: And the sergeant told you.


 [Gaines]: No. That's not what happened. They asked me, "Well, do
you think it's either officer's height?" And it wasn't
Schmidt. He was Ruland's height. And then they told me
the height of the suspect.


 [Defense]: So, the officers told you the height of the person who was
in Position No. 3?


 [Gaines]: Right.


 [Defense]: And then after you were told the height, you said that you
felt you could -- you were confident that that was the
shooter, correct?


 [Gaines]: Correct.


Gaines was not given the height of any other individuals in the photo array. After the
photo array, Gaines was shown a live line-up. Appellant contends that because
Gaines had been told appellant's height while viewing the photo array, the live line-up reinforced her identification of appellant.

 Concerning appellant's facial hair, Gaines testified that at the viewing of the
photo array she immediately identified the photo of appellant. She stated that she
didn't believe the shooter had facial hair, as appellant's photo showed. The officers
reminded her that facial hair could change and told her she could "cover that part up." 
Officer Schmidt testified that when giving witnesses, including Gaines, a photo array,
he instructs the witness that "they're not obligated to pick anybody in the photo, that
the person of interest may not be in the photo" and explains "they should focus on
facial features and eyes and things of that nature, that hairstyles and facial hair are
subject to change." Officer Schmidt also testified that Gaines told him that "she
didn't remember the shooter having a mustache during the time of the incident." In
response, Officer Schmidt's partner covered up the hair on all the pictures and
advised Gaines she could cover up any facial hair on the pictures. After doing so,
Gaines was confident that appellant's photo was the photo of the shooter.

 Appellant does not cite to any cases with similar facts or circumstances to
support his contention that the procedure described above was impermissibly
suggestive. The record does not show that the officers pointed out appellant or
suggested that the suspect was included in the line-up or photo array. See Barley, 906
S.W.2d at 33. Officer Schmidt's partner covering the hair in all the photos and telling
Gaines she could cover the facial hair in the photos did not suggest to Gaines she
should select appellant's photo. In fact, Gaines had already "focused" on appellant's
photo and stated she thought it was a photo of the shooter. We conclude the reference
to hair and facial hair was not unnecessarily suggestive and conducive to irreparable
mistaken identification that appellant was denied due process of law. See Webb, 760
S.W.2d at 272. 

 Concerning appellant's height, at the photo array viewing, Gaines stated she
was confident appellant's photo was a photo of the shooter, but said she would be "a
hundred percent confident" if she knew that the person in that photo was shorter than
Officer Schmidt's partner. The officers then told her that the individual in the photo
she had selected was shorter than Officer Schmidt's partner. Although Gaines
learned from the officers the approximate height of the person she identified in the
photo array, Gaines learned that information after she stated she thought the photo
was of the shooter. Moreover, the officers did not single out the photo of appellant
before Gaines identified it as a photo of the shooter; for example, the officers did not
indicate that appellant was the only person shorter than Officer Schmidt's partner or
that appellant was the shortest person included in the photo array. 

 We also conclude the comment did not taint the live line-up. The officer's
comments about the height of the shooter did not make the live line-up impermissibly
suggestive because, even though Gaines knew the approximate height of the person
she had identified from the photo array, two of the five other people in the live line-up were each about the same height as appellant. The information about height,
therefore, would not have made the line-up unnecessarily suggestive. 

 We conclude the reference to appellant's height, made after Gaines had
identified appellant as the shooter, was not unnecessarily suggestive and conducive
to irreparable mistaken identification that appellant was denied due process of law. 
See id. Likewise we cannot conclude from this record that the reference to facial hair
and appellant's height, when considered together, had the cumulative effect of
rendering the pre-trial identification impermissibly suggestive. See Barley, 906
S.W.2d at 33 (noting that individual procedure may be suggestive or cumulative
effect of procedures may be suggestive). 

 C. Totality of Circumstances Analysis

 Even if the procedure used in this case was impermissibly suggestive, if the
totality of the circumstances indicates that there was no substantial likelihood of
misidentification, the identification evidence will be considered reliable and
admissible. See Ibarra v. State, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999). The
factors used to make this determination are: (1) the witness's opportunity to view the
criminal act, (2) the witness's degree of attention, (3) the accuracy of the suspect's
description, (4) the level of certainty at the time of confrontation, and (5) the time
between the crime and confrontation. Id.; Barley, 906 S.W.2d at 34-35. Throughout
this process, the burden is on the movant to show impermissible suggestion and
substantial likelihood of misidentification by clear and convincing evidence. See
Barley, 906 S.W.2d at 33-34. 

 Here, Gaines had a good opportunity to view the criminal act and had a high
degree of attention. She was only a few feet away in a lighted parking lot. Gaines
testified, "I could watch all of it. Just like I'm looking at you, I could see all of it
happen." Gaines description of the suspect was very similar to appellant. Although
over two years had passed between the time of the crime and the time of the photo
array, Gaines immediately focused on the photo of appellant in the photo array and
was confident in her identification of him. At the live line-up, Gaines said of
appellant, "Those are his eyes," and appeared visibly shaken up. After identifying
appellant in court, Gaines testified, "I'll just never forget his face. I did watch the
whole incident like a movie. The incident is just embedded in my brain. His eyes,
I will never, ever forget; and I will never forget his face." Considering all the
circumstances surrounding Gaines identification of appellant, we conclude that there
was no substantial likelihood of misidentification and Gaines's testimony was
admissible. See Ibarra, 11 S.W.3d at 195; see also Coleman v. State, 760 S.W.2d
356, 360 (Tex. App.--Houston [1st Dist.] 1988, pet. ref"d) (holding in-court
identification based solely on recollection of crime is admissible, even if any
improper suggestiveness occurred in pre-trial identification). We overrule appellant's
first issue.

Charge Error

 Appellant contends that the trial court committed reversible error by not
including an instruction on felony murder as a lesser-included offense of capital
murder.

 We use a two-pronged test to determine whether a defendant is entitled to an
instruction on a lesser-included offense. See Hall v. State, 255 S.W.3d 524, 528 (Tex.
Crim. App. 2007). The first prong is to determine whether an offense is a lesser-included offense of the alleged offense. Id. The second prong is to determine if there
is some evidence, "anything more than a scintilla," that would permit a rational jury
to find that the defendant is guilty of the lesser offense but not guilty of the greater. 
Id. at 536.

 A defendant commits capital murder if he intentionally or knowingly causes
the death of an individual in the course of committing or attempting to commit
robbery. Tex. Penal Code Ann. § 19.03(a)(2) (Vernon Supp. 2008). A defendant
commits felony murder if he "commits or attempts to commit a felony, other than
manslaughter, and in the course of and in furtherance of the commission or attempt,
or in immediate flight from the commission or attempt, he commits or attempts to
commit an act clearly dangerous to human life that causes the death of an individual." 
Id. § 19.02(b)(3) (Vernon 2003). In other words, capital murder requires the specific
intent to kill the complainant and felony murder does not. See Salinas v. State, 163
S.W.3d 734, 741 (Tex. Crim. App. 2005). 

 Because the State concedes felony murder is a lesser-included offense of
capital murder, we address only the second prong by examining whether the evidence
would allow a rational jury to find, if appellant was guilty, that he was guilty only of
felony murder. See Hall, 225 S.W.3d at 536. Under the second prong, if evidence
from any source raises the issue of a lesser-included offense, a charge on that offense
must be included in the court's charge. Saunders v. State, 840 S.W.2d 390, 391 (Tex.
Crim. App. 1992). A defendant may be shown to be guilty only of the lesser offense
if the evidence presented is subject to different interpretations. Id. at 392. If the
evidence raises two inferences regarding the defendant's culpable mental state, then
the jury should be instructed on both inferences. Id.

 Appellant contends the testimony by Corley shows appellant did not intend to
kill complainant because Corley testified that appellant said complainant was
reaching for appellant's gun when appellant shot complainant. However, Corley's
testimony shows appellant intentionally killed complainant. Corley testified,

 I guess he [complainant] wasn't complying, you know, to the commands
of the defendant. But the guy was kind of like resisting. And he told me
that the guy tried to reach for the gun, you know. So, he said he shot the
guy. . . He said he shot the guy in the torso area and the guy fell or
whatever and he was searching the guy.


Corley's testimony shows appellant intentionally shot complainant in response to
complainant trying to reach for the gun.

 Appellant also contends the testimony by Galamison supports the inference that
the shooting was not specifically intended to cause complainant's death because
appellant and complainant were struggling over the gun. However, Galamison's
testimony shows only that the shooting was intentional. Galamison testified as
follows: 

 [Galamison]: As I was taking the order at the largest table that's
closest to these windows, there was some kind of
altercation right outside, directly outside the
windows on this bench.


 [Defense]: How could you tell that an altercation was taking
place?


 [Galamison]: The movement of the two people that were, I guess,
scuffling. Their arms were moving very vigorously
as if there was some kind of struggle going on. . . 


 [Defense]: Did it appear to you that they were struggling where
they were standing or while they were on the ground
or on the bench or could you tell?


 [Galamison]: Well, as I looked over, one person seemed to be
standing over the person that was kind of on the
bench. So, it looked as if he was at an angle to the
person that was sitting on the bench. So, it was like
one person was hitting down and the other was
trying to defend themselves up.


 [Defense]: Did it look like they were struggling with each other
and actually making contact with each other?

 

 [Galamison]: Yes.


 [Defense]: Did it look like each was trying to swing on the
other person?


 [Galamison]: Uh-huh. It looked like there was definitely -- I don't
want to say one person was besting the other
because I couldn't really see that clearly. But one
person was swinging and the other person was
swinging, too. So, it was a fight. . .


 [Defense]: And at the end of that time, being 30 seconds or
close to that, did something else happen?


 [Galamison]: Yes.


 [Defense]: What was that?


 [Galamison]: There was a gunshot fired.


 [Defense]: Was there any way for -- and when it was fired, was
that during the time that you were looking at the
table at the time -- excuse me, out the window or at
a time that you were trying to distract your
customers?


 [Galamison]: I was looking at the windows when the shot was
fired, like I saw the gun go off. . .


 [Defense]: What did you think of that -- who were you able to
determine, if you could, as to who probably fired the
weapon?


 [Galamison]: Well, every time that I looked and when I was
watching the altercation, the person that started in
the standing position [appellant] that was leaning
over the person on the bench, he never lost his
position. So, the person sitting down was never able
to get up. It had to be the person that was standing.


 Although her testimony shows a struggle took place, it also shows that
appellant was hitting down on complainant and "never lost his position." The record
also shows that complainant was trying to defend himself and "was never able to get
up." The evidence shows that appellant chased complainant, held him at gunpoint,
physically overpowered complainant, and then shot him. Nothing in Galamison's
testimony suggests that appellant lacked the intent to shoot and kill complainant. 
Moreover, nothing in Gaines's testimony, which similarly describes the struggle,
supports appellant's position. 

 We hold the trial court did not err by denying appellant's request for an
instruction on felony murder as a lesser-included offense. We overrule appellant's
second issue.

Conclusion

 We affirm the judgment of the trial court.





 Elsa Alcala

 Justice

Panel consists of Justices Jennings, Alcala, and Higley.

Do not publish. Tex. R. App. P. 47.2(b).