MEMORANDUM OPINION



No. 04-06-00061-CR



Joshua RAMON,


Appellant



v.



The STATE of Texas,


Appellee



From the 399th Judicial District Court, Bexar County, Texas


Trial Court No. 2004-CR-4416B


Honorable Pat Priest, Judge Presiding (1)



Opinion by: Steven C. Hilbig, Justice


Sitting: Alma L. Lopez, Chief Justice

 Phylis J. Speedlin, Justice

 Steven C. Hilbig, Justice


Delivered and Filed: September 19, 2007


AFFIRMED



 A jury convicted appellant Joshua Ramon of aggravated robbery with a deadly weapon and
aggravated assault with a deadly weapon. The jury imposed a term of confinement for 7 years, 6
months on the robbery and 2 years on the assault. The trial judge ordered the sentences to run
concurrently. In a single issue, appellant contends the evidence was factually insufficient to support
a finding of guilt beyond a reasonable doubt as to both charges. More specifically, appellant
challenges the sufficiency of the evidence to support his identification as the actor. We affirm.

Factual and Procedural History


 On April 9, 2004, Diana Macias drove to The Money Box to cash her paycheck. She was
accompanied by her mother, Anita Guevara. Macias went inside to cash her check; her mother
remained in the vehicle. After cashing her check, she placed the money in her purse and walked
outside. As she placed her hand on the door of her vehicle, she was approached by a man who asked
her for the time. After she told him the time he grabbed her by the neck, pulled her down, and tried
to stab her three times with "a large kitchen knife." He grabbed her purse and ran. During the
attack, Guevara was screaming. She eventually got out of the vehicle and tried to chase the attacker
but Macias called her back. Macias ran back inside The Money Box and asked them to call the
police. The police ultimately told Macias they had apprehended two men. An officer explained that
two patrol cars would drive by and she was asked if she could identify her attacker. She testified she
identified the man in the second patrol car (appellant) as her attacker. She could not identify the
person in the back of the first patrol car. After that, she and her mother went to the police station
where they gave statements and again identified appellant as the attacker. During trial, Macias
identified appellant as the robber stating, "There is no doubt in my mind." 

 Guevara confirmed that on April 9, 2004, she went with her daughter, Macias, to The Money
Box. She testified that just as Macias was about to get into the vehicle after cashing her check, a
man approached her. According to Guevara, the man grabbed Macias by the neck, grabbed her
purse, and began trying to stab her. The man had "a large knife" in his hand. Guevara was in the
vehicle when the attack on her daughter began. Guevara got out of the truck and ran toward her
daughter and the attacker, screaming at her daughter to "let go of the purse." The robber ran away
after he obtained the purse. Macias and Guevara went inside The Money Box to call the police. 
Guevara was able to identify her daughter's attacker as one of the men in the patrol cars. At the
police station later that same day, she identified appellant as the attacker. She also identified
appellant in court.

Gustavo Menchaca testified he worked at the Wheel & Tire Outlet located in the same
shopping center as The Money Box. The day Macias was attacked he was waiting outside in his
vehicle for his manager to open the store. While he was waiting, he saw a green vehicle with a
dragon on the door. Menchaca noticed someone sitting on the driver's side but no one on the
passenger side. At the same time he noticed a man inside The Money Box who came out and ran
toward the green vehicle. That same man then ran back towards The Money Box. Menchaca then
noticed a struggle in his rearview mirror and "heard the lady screaming." The man involved in the
struggle was the same man he had seen inside The Money Box and he was trying to take Macias's
purse. Menchaca stepped out of his vehicle and approached the attacker who was walking away with
the purse. Menchaca backed off when the attacker displayed the knife, pointed it in Menchaca's
direction, and while gesturing with the knife said, "Don't even try it." Menchaca testified he thought
the attacker was going to try to "stab [him] or something" and he was concerned for his safety. The
attacker was no more than three or four feet away from Menchaca during the confrontation. 
Menchaca backed off and the attacker then ran towards and entered the green car. The attacker and
the other man sped off in the green car. Menchaca and his cousin, who also worked at the Wheel
& Tire Outlet, followed the green vehicle in the cousin's car, a white vehicle. They were followed
by a person in a red vehicle who had also witnessed the robbery and decided to chase the suspect. 
Menchaca saw the green vehicle park in front of a house. They drove past the green vehicle and a
few minutes later the police arrived. Menchaca pointed police to the green vehicle. As the officer
approached the green vehicle, two men got out of the car and headed toward the back of the house. 
Menchaca and his cousin left the location and returned to The Money Box. Menchaca later provided
a statement to police. At trial, he identified the knife and identified appellant as the man who
threatened him with it. 

 Balcones Heights Police Officer Richard Bryan received a "robbery in progress" call from
the dispatcher. He was told the robbery was at The Money Box. As he was driving toward the
location he saw a white car run a stop sign "at a high rate of speed," followed by a red vehicle. 
Believing the vehicles might be fleeing the scene of the robbery, he advised the dispatcher that he
might have a suspect vehicle. Officer Bryan turned on his emergency lights and joined the pursuit. 
After turning into a residential area, Officer Bryan observed that both the white and red vehicles had
stopped. The people in the vehicles got out, approached Officer Bryan, and pointed out a green
vehicle, which they claimed the robbery suspects were driving. The green vehicle was parked in
front of a house at 214 Concord.

 Officer Bryan slowly approached the vehicle "looking for any suspicious - anybody that was
out trying to evade." In the backyard of 214 Concord he saw two people he believed to be the
robbery suspects looking at him. Officer Bryan got out of his vehicle and began to run toward them
yelling, "Stop police. Stop police." The officer lost sight of the two suspects when they ran. Officer
Bryan began a foot pursuit. He could hear rustling of the bushes and trees between the back of 214
Concord and the house behind it, 217 Altgelt, and knew somebody was running back there. He ran
toward the noise. When he ran around the bushes at the back of 217 Altgelt, he "met the defendant,"
who was running toward him. According to Officer Bryan, appellant looked "shocked" when they
confronted each other. Appellant immediately threw up his hands and gave up. Officer Bryan
placed appellant under arrest and began escorting him to the patrol car. At trial, Officer Bryan
identified appellant as the person he encountered behind 217 Altgelt.

 Balcones Heights Investigator Powers arrived and pulled up beside Officer Bryan as he was
walking appellant back to the patrol car. Officer Bryan was briefing Investigator Powers when
appellant shouted that the other suspect was trying to take off in the green vehicle. Investigator
Powers positioned his car behind the green vehicle to block it. Investigator Powers removed the
man, later identified as Christopher Gonzalez, from the green vehicle. Gonzalez, who had been
wearing a blue-and-white striped shirt when he was first seen by Officer Bryan in the backyard of
214 Concord, was shirtless. He was placed under arrest. 

 After appellant and Gonzalez were taken into custody, Balcones Heights Police Officer
Robert North secured the green vehicle. He saw a large knife in the rear floor board on the passenger
side. Officer North also observed a blue-and-white striped shirt, a pair of sunglasses, and a baseball
cap. When Officer North inventoried the vehicle he found the shirt was damp, as if someone had
been sweating. (2) Macias's purse was found hidden in a bush at 214 Concord, the house where the
green vehicle was parked.

The two suspects were driven back to The Money Box to see if Macias and her mother, 
Guevara, could identify them. The suspects remained in the officers' patrol cars with Christopher
Gonzalez in one patrol car and appellant in the other. Officers drove the cars slowly past the
witnesses at a distance of seven-to-nine feet. Both Macias and Guevara "almost simultaneously"
identified appellant as the man who assaulted Macias and took her purse. Neither could identify
Christopher Gonzalez.

After the identification, appellant and Gonzalez were both placed in the backseat of Officer
North's patrol car for transport to the Magistrate's office. Officer North testified that during the
twelve to fifteen minute drive appellant and Gonzalez "whispered to one another and were -
appeared to be as though they knew each other." According to the officer they appeared to be
comfortable with each other and neither yelled at the other. 

Macias and her mother traveled to the police station where they each gave a statement to
Investigator Troy Lee Powers, Jr. Investigator Powers asked them to "have another look" at the
suspects. Investigator Powers walked Macias and Guevara back to the cells where Gonzalez and
appellant were being held. Once again Macias and Guevara identified appellant "as the one with the
knife." They were still unable to identify Christopher Gonzalez.

 Appellant called his father, Norbert Ramon, as his only witness. Ramon admitted appellant
was living in San Antonio on April 9, 2004, the day of the robbery and assault. According to
Ramon, appellant had only been in San Antonio for two weeks having lived with Ramon in Houston
before coming to San Antonio. Appellant was trying to "get away from Houston for a while and
. . . - to try and - to make - a new lifestyle."

 Ramon also testified he had purchased the green vehicle with the dragon on the door for
appellant. He admitted he gave the car to appellant in San Antonio just days before the robbery and
assault.

 Appellant was charged with aggravated robbery with a deadly weapon based on the attack
on Macias. He was also charged with aggravated assault with a deadly weapon based upon the
confrontation with Menchaca. He was convicted of both charges and now appeals those convictions.Issue Presented

Appellant contends the evidence was factually insufficient to support a finding of guilt
beyond a reasonable doubt on either the aggravated robbery or the aggravated assault charges. His
only challenge is to identity. He contends the evidence was insufficient to establish he was the
robber because the eyewitness testimony was unreliable. (3) 

Analysis

Standard of Review

In a factual sufficiency review, the court views "'all the evidence without the prism of in the
light most favorable to the prosecution and sets aside the verdict only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.'" Cain v. State, 958 S.W.2d
404, 407 (Tex. Crim. App. 1997) (quoting Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim. App.
1996)); see Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006) (explaining that the "basic
ground rules for post-Clewis factual-sufficiency review were well articulated in Cain v. State"). In
conducting this review, we must "be mindful that a jury has already passed on the facts, and
convicted, and that the court should never order a new trial simply because it disagrees with the
verdict, but only where it seems to the court to represent a manifest injustice, though supported by
legally sufficient evidence." Watson, 204 S.W.3d at 414. Watson directs us to Johnson v. State, 23
S.W.3d 1 (Tex. Crim. App. 2000), which breaks down the factual sufficiency analysis into two
prongs. Under the first prong we ask whether the evidence is "so weak" that the jury's verdict seems
"clearly wrong and manifestly unjust." Johnson, 23 S.W.3d at 11. We then ask whether,
considering the conflicting evidence, the jury's verdict, though legally sufficient, is nevertheless
against the great weight and preponderance of the evidence. Id. If we find that a manifest injustice
has occurred, we must explain how the State's evidence is too weak to withstand scrutiny or how
the conflicting evidence greatly preponderates against conviction. Watson, 204 S.W.3d at 414. 

Application

 Appellant's theory appeared to be that Christopher Gonzalez was the actual robber and that
he was simply an innocent victim of Gonzalez's actions. Appellant points out that during cross-examination, evidence was solicited that challenged the witnesses' identification of appellant as the
person with the knife. Specifically, appellant contends the evidence established the attacks on
Macias and Menchaca happened quickly thus giving the witnesses little time to view the actor's face. 
He also points out that the witnesses were scared and upset, which would bring into doubt their
ability to focus on the attacker. He contends they would have been focused on the knife rather than
the attacker. Appellant also questions Guevara's ability to have viewed the robber given her height
and position in the vehicle, as well as her limited opportunity to view the suspect once she exited the
vehicle to assist her daughter. 

 Appellant clearly attempted to solicit evidence challenging each witness's identification of
appellant as the person wielding the knife. However, as detailed above, each witness unquestionably
identified appellant as the attacker and wholly failed to identify Gonzalez. Macias identified
appellant as her attacker no less than three times. The final identification was in court where she
stated, "[t]here is no doubt in my mind," appellant was the robber. Guevara also identified appellant
three times, concluding with her in-court identification. While Menchaca never made any pretrial
identification of appellant, he identified appellant at trial as the man who attacked Macias and took
her purse and as the man who threatened him with the knife. 

 All of these eyewitnesses were certain appellant was the robber and identified him at trial. 
An in-court identification of the defendant by a witness is sufficient to overcome a factual
sufficiency challenge based on identity. See, e.g., Ford v. State, 509 S.W.2d 317, 318 (Tex. Crim.
App. 1974) (holding that son's identification of appellant as person who shot son's father was
sufficient to support murder conviction); Garcia v. State, 563 S.W.2d 925, 928 (Tex. Crim. App.
1978) (holding rape victim's in-court identification of appellant was sufficient to overcome claim
evidence was insufficient as to identity); Moore v. State, 446 S.W.2d 877, 878 (Tex. Crim. App.
1969) (holding store employee's identification of appellant as thief was sufficient to uphold
conviction). Moreover, any discrepancies in testimony or issues of reliability brought out on cross-examination were issues of credibility and, as the sole fact finder, the jury was the exclusive judge
of the witnesses' credibility and the weight to be given their testimony. See Poindexter v. State, 153
S.W.3d 402, 406 (Tex. Crim. App. 2005). 

Conclusion

Accordingly, considering the evidence in a neutral light, we hold it is not so weak as to render
the jury's verdict "clearly wrong and manifestly unjust." See Johnson, 23 S.W.3d at 11. 
Furthermore, after considering the allegedly conflicting evidence, we hold the jury's verdict is not
against the great weight and preponderance of the evidence. Id. We therefore affirm the judgment. 


 Steven C. Hilbig, Justice

Do Not Publish



1. Senior Judge Pat Priest sitting by assignment. 
2. Officer North noted there were several striped shirts found on the suspects or in the green vehicle. He opined
that criminals will often change into a similar looking but different shirt following criminal activity in order to attempt
to confuse law enforcement during a chase. (4RR 33) 
3. In his brief, appellant attempts to morph his factually sufficiency challenge into a challenge to the witnesses'
in-court identification based upon the pretrial identification procedures used by police. Appellant cites Neil v. Biggers,
409 U.S. 188, 199 (1972) and argues we should evaluate the reliability of the witnesses' testimony in light of the factors
set forth therein. Appellant's reliance on Biggers, however, is misplaced because the Biggers analysis applies only when
the in-court identification is allegedly tainted by an overly suggestive pretrial identification procedure. See id.; see also
Webb v. State, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988), cert. denied, 491 U.S. 910 (1989). In this case appellant
never claimed the in-court identifications should not have been admitted due to taint by an impermissibly suggestive
pretrial identification procedure. He admits no pre-trial motion to suppress the in-court identifications was filed, nor
were any objections made during the testimony of the witnesses based on allegedly improper pretrial identification
procedures. Thus appellant has failed to preserve error with regard to any challenge to the in-court identifications based
on allegedly suggestive pretrial identification procedures. See Perry v. State, 703 S.W.2d 668, 670-71 (Tex. Crim. App.
1986) (holding that failure to object to in-court identification or to testimony based on impermissibly suggestive
identification procedure waives error); see also Pena v. State, 191 S.W.3d 133, 136 (Tex. Crim. App. 2006) (holding
appellate courts are free to review "unassigned error," which is error that is preserved by proper objection or complaint
in the trial court, but not raised on appeal). Accordingly, we do not review any alleged challenge to the witnesses' in-court identification.