**Ray Lee GILSTRAP, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 10–01–140–CR, 10–01–141–CR.**

Court of Appeals of Texas,
Waco.

Dec. 5, 2001.

Henry L. Burkholder, Houston, for appellant.

Charles A. Rosentral, Jr., Harris County Dist. Atty., William J. Delmore, III, Harris County Asst. Dist. Atty., Houston, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

BILL VANCE, Justice.

Ray Lee Gilstrap was charged in two indictments with the attempted capital murder of two peace officers. Gilstrap pled not guilty, but a jury found him guilty in each case and assessed his punishment at imprisonment for fifty years. On appeal, Gilstrap contends (1) the trial court erred in failing to suppress identification testimony and (2) the evidence is legally and factually insufficient to support the jury's verdict. We will affirm.

## BACKGROUND

These facts were developed at Gilstrap's trial. During the evening of November 21, 1999, two men wearing ski masks invaded the Houston apartment shared by Jose Salazar, Antonio Sanchez, and J.I. Montalvo. The two men robbed the roommates at gunpoint. According to the victims' testimonies, Gilstrap was one of the robbers and he had taken off his ski mask. The other was later identified as Reagan Jones. The victims also testified that Gilstrap was the one who pistol-whipped and kicked them. A neighbor called the Houston Police Department when he heard the victims' screams. Houston police officers arrived at the apartment complex while Gilstrap and his accomplice were still in

the apartment. Officer Jason Calley knocked on the apartment door and asked the occupants to open it. Officer Calley testified that Gilstrap eventually opened the door, but he barricaded himself behind it and refused to comply with the officer's requests to show his hands. Officer D.R. Saenz testified that he saw Gilstrap raise his arm and shoot Calley in the arm. Officer Calley was thrown backward by the gunshot, and his arm was severely injured. Officer Saenz carried Calley to safety.

Officer Sergio Garcia testified that he saw Gilstrap run out of the apartment, gun in hand, firing his weapon at other police officers. Officer Garcia saw Gilstrap shoot and felt a bullet in his leg as he tried to help another police officer who was down. Gilstrap then entered a pick-up truck and waited for his accomplice to join him. Gilstrap crashed the truck through two patrol cars as he escaped from the apartment complex. The police officers were unable to pursue the two robbers. The truck was later found with a flat tire a few blocks from the apartment complex. On the floorboard of the truck, investigators found an offender identification card issued by the Texas Department of Criminal Justice to one Brandon Dominy.

The next day, a Galveston County sheriff's deputy observed two individuals leaving Brandon Dominy's residence in Bayshore in a pick-up truck. The deputy stopped the vehicle after the driver failed to signal a turn. The deputy arrested the driver, Reagan Jones, for the traffic offense, and he arrested the passenger, Josh Jarmino, for failure to use a seat belt. Under Jones' seat, the deputy found a .45 caliber revolver and a .22 caliber semi-automatic pistol. Ballistics testing revealed that these weapons were the ones which discharged the bullets and cartridge casings found at the apartment complex where the shooting incident occurred.

The day after Jones and Jarmino were arrested, a constable's deputy followed another pick-up truck which matched the description of a vehicle that might have been involved in the shooting incident. Gilstrap was the driver of the vehicle. He led the deputy on a high-speed chase to avoid being stopped, and the deputy was unable to follow him. A few hours later, another constable's deputy saw Gilstrap riding on a bicycle in the area of the earlier pursuit. Gilstrap saw the deputy, jumped off the bicycle, and fled on foot. The deputy apprehended Gilstrap as he tried to pry open a shed behind a nearby business.

Gilstrap was placed in a line-up on the day of his arrest. The five "fill-ins" who appeared in the line-up with him were police academy cadets chosen for their general resemblance to Gilstrap. All the participants in the line-up were barefoot and dressed in jail jumpsuits. They also wore bandages to cover the areas of the body in which Gilstrap bore tattoos. The three victims of the home-invasion robbery positively identified Gilstrap as the robber who had taken off his mask. Officer Garcia positively identified Gilstrap as the gunman who shot him in the leg. Officer Erick Eckel tentatively identified Gilstrap as the first man to run out of the apartment after officer Calley was shot. A videotape of the line-up was later shown to officers Calley and Saenz, and they positively identified Gilstrap as the gunman who shot at them. None of the police officers who attended the line-up or viewed the videotape of the line-up recognized any of the "fill-ins" who participated in the line-up with Gilstrap. Moreover, DNA material was recovered from the mouth area of the two ski masks found inside the apartment. The DNA recovered from the masks matched, with an extremely high

level of probability, DNA samples obtained from Gilstrap and Reagan Jones.

In two indictments, Gilstrap was charged with the attempted capital murder of officers Calley and Garcia. TEX. PEN. CODE ANN. §§ 15.01(a), 19.03(a)(1) (Vernon 1994). For the purpose of enhancement of punishment, each indictment included an allegation that Gilstrap had previously been convicted of a felony offense. *Id.* § 12.42(c) (Vernon Supp.2001). Gilstrap pled not guilty to each charge. After a trial, a jury found him guilty of both offenses and also found that a deadly weapon was used in the commission of each offense. The jury found the enhancement paragraphs of the indictments to be true and assessed Gilstrap's punishment in each case at imprisonment for fifty years. Gilstrap brings this appeal contending that the trial court erred in failing to suppress identification testimony. He also says the evidence is legally and factually insufficient to support the jury's verdicts.

## IDENTIFICATION TESTIMONY

In eight points of error, Gilstrap argues: 1) the trial court erred in admitting out-of-court identifications of him by four police officers, because the pretrial identification procedure was impermissibly suggestive in violation of his right to due process under the United States and Texas Constitutions, and 2) the trial court erred in admitting the testimony of the same witnesses' in-court identifications of him because they were tainted by an impermissibly suggestive out-of-court identification procedure.

**Applicable law**

■ A pretrial identification procedure may be so suggestive and conducive to mistaken identification that its use at trial would deny the accused due process of law. *Stovall v. Denno,* 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). Identification testimony should be excluded when the pretrial identification procedure is impermissibly suggestive, giving rise to a substantial likelihood of misidentification. *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972). It is the "substantial likelihood of misidentification" resulting from a suggestive identification procedure that causes the deprivation of due process. *Webb v. State,* 760 S.W.2d 263, 269 (Tex. Crim.App.1988). When the identification procedure is not impermissibly suggestive, there is no need to determine whether it in fact created a substantial likelihood of misidentification. *Id.*

■ Even if the pretrial procedure is suggestive, but the totality of the circumstances reveals no substantial likelihood of misidentification, the identification will be deemed reliable. *Manson v. Brathwaite,* 432 U.S. 98, 113–14, 97 S.Ct. 2243, 2252–53, 53 L.Ed.2d 140 (1977). Reliability is the linchpin in determining the admissibility of identification testimony. *Id.* at 114, 97 S.Ct. at 2253. The following factors of reliability should be considered in analyzing the totality of the circumstances: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the perpetrator; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382; *Webb,* 760 S.W.2d at 269. Any corrupting effect of a suggestive identification is to be measured by considering these factors. *Manson,* 432 U.S. at 114, 97 S.Ct. at 2253.

## Standard of review

■ When reviewing a trial court's denial of a motion to suppress regarding identification testimony, we are presented

with a mixed question of law and fact, and therefore our review is *de novo*. *Loserth v. State*, 963 S.W.2d 770, 773 (Tex.Crim. App.1998) (citing *Guzman v. State*, 955 S.W.2d 85 (Tex.Crim.App.1997)). However, we should consider the five *Biggers* factors, which are all issues of historical fact, deferentially in the light most favorable to the trial court's ruling. *Id.*

**Out-of-court identifications**

Gilstrap complains that the trial court erred in admitting evidence of the out-of-court identifications by four police officers, because the pretrial identification procedure was impermissibly suggestive, thereby violating his due process rights guaranteed by the United States and Texas Constitutions.

The following facts were developed at a pretrial hearing. Officers Garcia, Eckel, Calley, and Saenz were eye-witnesses to the shooting incident of November 21, 1999. On November 23, 1999, officers Garcia and Eckel viewed a live line-up conducted by Sergeant C.E. Elliott of the Houston Police Department. Gilstrap was in the line-up along with five "fill-ins." Sergeant Elliott testified that the "fill-ins" were police academy cadets that matched the same general description as Gilstrap. They were within two inches of Gilstrap's height. They were also of similar build, weight, and age as Gilstrap. In addition, they had a similar hairstyle. Everyone in the line-up wore a white jail jumpsuit and was barefoot. White cotton bandages were used to cover up Gilstrap's tattoos on his neck and arm. Every "fill-in" had bandages on the same areas of their bodies as Gilstrap.

Officer Garcia positively identified Gilstrap as the gunman who had shot him in the leg. He testified that, when viewing the line-up, he did not know that the "fill-ins" were police academy cadets. Garcia admitted that he had recently been to the police academy for in-service training and that there was a remote possibility that he might have encountered the "fill-ins" when he was at the academy. However, Garcia testified that such a possibility did not affect his identification of Gilstrap because he did not recognize any person in the line-up other than Gilstrap. Officer Eckel testified that after viewing the line-up, he made a tentative identification of Gilstrap. While viewing the line-up, Eckel did not know that the "fill-ins" were police academy cadets. He said that he is required to attend in-service training at the academy, and he conceded that it was possible that he might have visited the academy when the "fill-ins" in the line-up were still cadets. However, he testified that he recognized only Gilstrap and nobody else in the line-up.

Officers Calley and Saenz viewed a videotape of the same line-up. After viewing the line-up, Calley positively identified Gilstrap as the gunman who shot him in the arm. Calley was not aware that the "fill-ins" were cadets when he viewed the line-up. He testified that he goes to the academy for in-service training and that it was possible that he might have encountered the "fill-ins" when he visited the academy. However, he did not recognize anyone in the line-up other than Gilstrap. Officer Saenz also viewed a videotape of the line-up. A sergeant showed him the videotape and did not suggest to Saenz that the suspect was in the line-up. Saenz positively identified Gilstrap. He did not know at the time that the "fill-ins" were cadets. He emphasized that he recognized Gilstrap and no one else. He admitted that he later became aware that one of the "fill-ins" is now an officer at his station. He reiterated that he did not recognize anyone other than Gilstrap when he viewed the line-up.

Gilstrap contends that the identification procedure Sergeant Elliott used was "highly suggestive." According to Gilstrap, since each officer admitted that there was a possibility that they might have been at the academy for in-service training while the "fill-ins" in the line-up were still cadets, the identification procedure was impermissibly suggestive.

 The Court of Criminal Appeals has stated that "suggestiveness" may be created by the manner in which the pretrial identification procedure is conducted. *Ibarra v. State*, 11 S.W.3d 189, 196 (Tex. Crim.App.1999). However, neither due process nor common sense requires that the physical characteristics of the participants in a line-up be identical. *Buxton v. State*, 699 S.W.2d 212, 216 (Tex.Crim.App. 1985). In *Buxton*, the Court found that there was no suggestive procedure constituting a violation of due process, even though the men in the line-up ranged in height from five feet nine inches to six feet two inches, in weight from 175 pounds to 210 pounds, had various skin tones, and wore different types of clothing. *Id.* In *Williams v. State*, the Court concluded that a line-up was not impermissibly suggestive even though most of the participants appeared younger than the suspect. *Williams v. State*, 675 S.W.2d 754, 757 (Tex.Crim.App.1984). In *Garcia v. State*, the Court found that the line-up was not impermissibly suggestive even though the suspect was several inches taller than the other participants in the line-up. *Garcia v. State*, 563 S.W.2d 925, 929 (Tex.Crim. App.1978).

 There is no evidence from the pretrial hearing that the police pointed out Gilstrap or suggested that Gilstrap was included in the line-up. Although due process does not require that the physical characteristics of the participants in a line-up be identical, Sergeant Elliott testified that he did his best to use "fill-ins" who looked like Gilstrap. Elliott used cadets that were within two inches of Gilstrap's height. They were also of similar build, weight, and age. Everyone in the line-up wore a white jail jumpsuit and was barefoot. White cotton bandages were used to cover up Gilstrap's tattoos on his neck and arm, and the "fill-ins" had white cotton bandages on the same areas of their bodies as Gilstrap did. Moreover, the fact that the "fill-ins" were cadets was not significant because none of the police-officer witnesses recognized any of these participants. While the officers conceded that there was a remote possibility that they might have encountered one or more of the "fill-ins" while attending in-service training at the academy, the trial court was entitled to accept their testimonies that they did not recognize any of the "fill-ins" at the time of the line-up, and that they were not aware that the "fill-ins" were cadets. Comparing the line-ups found not to be suggestive in *Buxton*, *Williams*, and *Garcia* to the line-up here, we do not find that the line-up prepared by Sergeant Elliott was suggestive and, therefore, could not have been "impermissibly suggestive." Accordingly, we do not reach the five *Biggers* factors.

### In-court identifications

Gilstrap argues that the trial court erred in admitting testimony of the police-officer witnesses' in-court identifications of him because those identifications were tainted by the impermissibly suggestive out-of-court identification procedure. Because we find that the line-up was not impermissibly suggestive, it could not have tainted the in-court identifications. Therefore, they were properly admitted. Accordingly, Gilstrap's points of error one through eight are overruled.

## SUFFICIENCY OF THE EVIDENCE

*Issue of Identity*

In his ninth and tenth points of error, Gilstrap complains that the evidence is legally and factually insufficient to support the jury's determination that it was he who shot the officers. Gilstrap argues that the State failed to rebut his mistaken-identification evidence beyond a reasonable doubt.

**Legal sufficiency**

In reviewing a legal sufficiency challenge, we view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Johnson v. State*, 23 S.W.3d 1, 5 (Tex. Crim.App.2000).

Gilstrap's defense at trial was that he was not the gunman who shot and wounded Officers Calley and Garcia. He presented testimony from his sister-in-law in which she identified various photographs of Gilstrap and Josh Jarmino. Although his sister-in-law never testified that she believed that Jarmino and Gilstrap resembled each other, Gilstrap's defense counsel argued to the jury that it was Jarmino who was involved in the shooting incident with Reagan Jones, not Gilstrap. Gilstrap's defense counsel emphasized that Jones and Jarmino were stopped by a sheriff's deputy a few days after the incident, when the deputy found the weapons used in the robbery in their vehicle. Furthermore, Gilstrap argued that Garcia's identification of him as the gunman running out of the apartment was questionable because of the circumstances of the "running gun battle" between Garcia and the person shooting at him.

At trial, the State presented the following evidence on the issue of identity. Officer Saenz testified that he was standing directly behind officer Calley when Calley was shot by the gunman barricaded behind the apartment door. Saenz said that the gunman who shot Calley was Gilstrap. Saenz said he could not forget Gilstrap's "deep cold blue" eyes looking out of the window of the apartment. Calley also testified it was Gilstrap who shot him. The three victims of the robbery testified that Gilstrap did not always wear a ski mask like the other robber, and Gilstrap was the one who pistol-whipped and kicked them. Montalvo, one of the victims, said he saw Gilstrap at the door talking to officers Calley and Saenz. Officer Garcia testified he saw Gilstrap running out of the apartment with a .45 caliber gun in his hand. Garcia said Gilstrap shot him in the leg. The three victims made positive identifications of Gilstrap as one of the robbers at a line-up and in court. Officers Calley, Saenz, and Garcia made positive identifications of Gilstrap at a line-up and in court. Moreover, DNA evidence from the two ski masks recovered at the crime scene revealed there was a high probability that Gilstrap had worn one of those masks. Finally, Josh Jarmino was interviewed by the police and was eliminated as a suspect.

Viewing the evidence in the light most favorable to the State, we find that any rational trier of fact could have found that Gilstrap was the person who committed the attempted capital murder of officers Calley and Garcia. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Johnson*, 23 S.W.3d at 5. Thus, Gilstrap's ninth point of error is overruled.

**Factual sufficiency**

In contrast, in reviewing a challenge to the factual sufficiency of the evidence, we must view all the evidence without the prism of the "in the light most favorable to the prosecution" construct. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.

Crim.App.1996); *Perkins v. State*, 19 S.W.3d 854, 855 (Tex.App.—Waco 2000, pet. ref'd). Considering all of the evidence we ask "whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the [fact finder's] determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof." *Johnson*, 23 S.W.3d at 11.

■ We incorporate our discussion of Gilstrap's legal sufficiency challenge into our discussion of his claim of factual insufficiency. At trial, Gilstrap provided no direct controverting evidence on the issue of identity, only argument. Gilstrap's defense consisted only of his sister-in-law's testimony. His sister-in-law did not testify that Gilstrap resembled Jarmino. Gilstrap's defense counsel primarily relied on the sister-in-law to authenticate various photographs of Gilstrap and Jarmino. On the other hand, the State presented seven eye-witnesses who identified Gilstrap as the gunman who robbed the three roommates and who shot at the police injuring officers Calley and Garcia. After reviewing all of the evidence, both for and against the finding on the issue of identity, we find that the proof of guilt is not so obviously weak as to undermine confidence in the jury's determination that Gilstrap was the person who committed the offenses. *Id.*

Accordingly, Gilstrap's tenth point of error is overruled.

*Proof of officer Calley's status as a "peace officer"*

Gilstrap's eleventh and twelfth points of error contend that the evidence is legally and factually insufficient to support his conviction for attempted capital murder of Calley, because the State failed to prove that Calley was a "peace officer" at the time of the alleged offense.

### Legal sufficiency

As stated before, in reviewing a legal sufficiency challenge, we view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Johnson*, 23 S.W.3d at 5. The indictment alleged that Gilstrap:

> . . . did then and there unlawfully, intentionally, with the specific intent to commit the offense of capital murder of J. Calley, hereafter styled the Complainant, a peace officer in the lawful discharge of an official duty, do an act, to-wit: by shooting J. Calley with a firearm knowing at the time that the complainant was a peace officer, which amounted to more than mere preparation that tended to but failed to effect the commission of the offense intended.

The indictment tracked the statutory language for an attempted capital murder offense. Tex. Pen.Code Ann. §§ 15.01(a), 19.03(a)(1) (Vernon 1994).

■ Gilstrap contends that the State failed to prove that officer Calley was a "peace officer" at the time of the alleged offense, and therefore the State did not prove this element of attempted capital murder. Although Gilstrap concedes that Calley was a "police officer" at the time of the alleged offense, he claims that Calley's status as a "peace officer" was not established because Calley had not completed his probationary employment period with the police department. But Gilstrap's argument is based on a misreading of the record. Officer Calley testified that he was a probationary officer for six months after he graduated from the police academy in June 1998. He completed this probationary period in December 1998. The alleged offense occurred in November

1999. Thus, Calley had completed his probationary period almost one year prior to the date upon which Gilstrap tried to kill him.

Furthermore, the Penal Code defines "peace officer" as a "person elected, employed, or appointed as a peace officer under Article 2.12, Code of Criminal Procedure, Section 51.212 or 51.214, Education Code, or other law." TEX. PEN.CODE ANN. § 1.07(a)(36) (Vernon 1994). Article 2.12 of the Code of Criminal Procedure includes in its list of "peace officers": marshals or police officers of an incorporated city, town, or village. TEX.CODE CRIM. PROC. ANN. art. 2.12(3) (Vernon Supp.2001). Officer Calley testified at trial in 2001 that he had been a police officer for the city of Houston for three and a half years. We find that, based on this evidence, a rational trier of fact could have found beyond a reasonable doubt that officer Calley was a "peace officer," which is an essential element of the offense of attempted capital murder. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Johnson*, 23 S.W.3d at 5.

Gilstrap's eleventh point of error is overruled.

**Factual sufficiency**

As previously stated, in reviewing a challenge to the factual sufficiency of the evidence, we must view all the evidence without the prism of the "in the light most favorable to the prosecution" construct. *Clewis*, 922 S.W.2d at 129; *Perkins*, 19 S.W.3d at 855. Does a "neutral review of all the evidence, both for and against the finding, demonstrate that the proof of guilt is so obviously weak as to undermine confidence in the [fact finder's] determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof?" *Johnson*, 23 S.W.3d at 11.

█ We incorporate our discussion of Gilstrap's legal sufficiency challenge into

our discussion of his claim of factual insufficiency. To convict Gilstrap of the attempted capital murder of officer Calley, the jury had to find that Calley was a "peace officer" as defined in the Penal Code and the Code of Criminal Procedure. Calley testified at trial that he had been a Houston police officer for three and a half years. Gilstrap does not dispute this fact. Accordingly, Calley was a "peace officer" when the shooting incident occurred in November 1999. TEX. PEN.CODE ANN. § 1.07(a)(36); TEX.CODE CRIM. PROC. ANN. art. 2.12(3).

In misconstruing Calley's testimony, Gilstrap characterizes Calley's supposed "probationary" status as contrary evidence to the jury's finding that Calley was a "peace officer." As noted above, Calley testified that he completed his probationary employment period one year prior to the shooting incident. Thus, there is no contrary evidence to the fact that Calley was a "peace officer" at the time of the offense. We note that even if officer Calley was completing his probationary employment period when he was shot, he was licensed and commissioned as a "peace officer" upon graduation from the academy, and therefore his probationary status would have been relevant only to the level of his civil service protection. TEX. LOC. GOV'T CODE ANN. § 143.027 (Vernon 1999). Moreover, article 2.12 of the Code of Criminal Procedure does not exclude police officers who are completing their probationary period for employment security purposes from the definition of "peace officer." TEX.CODE CRIM. PROC. ANN. art. 2.12(3).

After reviewing all of the evidence, both for and against the finding on the issue of Calley's status, we do not find that the evidence is so obviously weak as to undermine confidence in the jury's determination that Calley was a "peace officer" at

the time of the offense. *Johnson*, 23 S.W.3d at 11. Accordingly, Gilstrap's twelfth point of error is overruled.

## CONCLUSION

Having overruled Gilstrap's twelve points of error, we affirm the judgment.