**Opinion issued February 25, 2014**



In The

# Court of Appeals

For The

# First District of Texas

—————————

## NO. 01-12-01180-CR

—————————

**KENNETH RAYSHAWN SHEPHARD, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 412th Judicial District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 62630**

---

## MEMORANDUM OPINION

Kenneth Rayshawn Shephard was charged by indictment with the felony offense of aggravated robbery. *See* TEX. PENAL CODE ANN. § 29.03 (West 2011). A jury found Shephard guilty and assessed a punishment of eight years'

imprisonment. On appeal, Shephard contends that the trial court erred in denying his motion to suppress and his motions for mistrial and in admitting evidence regarding the complainant's pre-trial show-up identification of Shephard. We affirm.

## Background

### *Motion to Suppress*

In his motion to suppress, Shephard argued that he was arrested without probable cause upon answering the door of his girlfriend's apartment and that the evidence obtained as a result of his arrest should be suppressed. Officer T. York of the Brazoria County Sheriff's Department testified at the hearing. On June 26, 2010 around 10:00 in the morning he responded to a dispatch call regarding a robbery. According to the dispatch, Richard Finch was leaving a drugstore, and as he was trying to get into his vehicle, a black male in his early 20s, who was sitting in a parked small silver SUV with a partial license plate of "V67," pointed a weapon at Finch and told him to "give him all of his stuff." York did not recall the dispatch containing a description of the suspect's clothing.

After receiving the dispatch, York drove toward where the suspect was last seen. York saw Finch's vehicle, a motor home, and began to search the area for an SUV that matched the description given. Eight to ten minutes after receiving the

2

initial dispatch, York located an unoccupied small silver SUV with a partial license plate of V67 on the east side of an apartment complex on Yerby Street, near where he had seen Finch's motor home. York notified dispatch that he had located the suspect vehicle, and confirmed that the hood of the car was hot, indicating that the car had been recently driven.

After Detective V. Ellison arrived, York left to check on Finch, who had returned to the drugstore. Finch told York that the driver had been wearing a black shirt and a black "do-rag." York then heard over the radio that a suspect had been detained, and was told to bring Finch to where the suspect vehicle was located to help identify him. York drove Finch to the location, had Finch stay inside his patrol car, and took the suspect out of the other patrol car. York had the suspect stand more than 15 feet away from the front of his patrol car and Finch positively identified Shephard as the robber.

Detective Ellison also testified at the hearing on the motion to suppress. She received a call on June 26, 2010 around 11:00 a.m. that there had been a robbery at a drugstore and that Officer York had located the suspect vehicle. Ellison drove to meet York. After York left to meet with Finch, Ellison started taking pictures of the vehicle. A woman approached Ellison and told her that the vehicle belonged to

3

her cousin, Tabitha Bell, and that Tabitha's boyfriend had been driving it. The woman told Ellison which apartment Tabitha lived in.

Ellison went to the apartment with two deputies and knocked on the door. She testified that she did not recall anyone unholstering a weapon. Shephard answered the door and identified himself, and the deputies handcuffed him and placed him in the back of a patrol car. Ellison testified that Shephard was detained, but not under arrest.

Ellison then contacted Tabitha Bell, the owner of the SUV and lessee of the apartment, and Bell gave verbal and written consent to search the SUV and the apartment. Bell told Ellison that Shephard was her boyfriend, and that he was driving her SUV that day.

According to Ellison, Shephard was detained at 11:40 a.m. and Officer York arrived at the scene with Finch at 11:42 a.m. Ellison testified that she "asked Mr. Finch to look very closely and identify him as either the one who attempted to rob him or did not." Finch identified him as the person who had robbed him, and Shephard was arrested. Ellison testified that about 15 minutes elapsed between the time she first made contact with Shephard and the time that Finch identified him.

Following the pre-trial hearing, the trial court denied Shephard's motion to suppress. The trial court entered written findings of fact and conclusions of law,

finding that Shephard was detained, not arrested, from the time he was handcuffed until the time he was identified by Finch. The trial court also found that the officers had reasonable suspicion to detain Shephard during that time.

*Trial*

The motion to suppress was not re-litigated at trial. At trial, Richard Finch testified that on June 26, 2010, he drove his 22-foot motor home to a drugstore in Brazoria to pick up medicine and gauze bandages for his wife. They arrived at the drugstore around 10:30 in the morning and Finch went inside to purchase the medicine and gauze, leaving his wife in the motor home.

Finch left the store holding the gauze, his wallet, and a checkbook. A small gray SUV had parked in the parking spot on the driver's side of the motor home, and Finch noticed that the SUV was running and the passenger side window was rolled down. Finch walked between the SUV and his motor home, and as he reached for the driver's side door handle on the motor home, he thought he heard somebody say "Give me your stuff." Finch was not sure what had been said, so he turned around and looked at the driver of the SUV, a young black male. He asked the driver "Do what?" The driver repeated "Give me your stuff." Finch then saw that the driver was reaching across the front seat of the SUV and pointing a semi-automatic pistol at him. Finch testified that he got a good look at the driver, and

5

that the driver was not wearing anything covering his face. He testified that he is required to go to the eye doctor every year because he is a DOT licensed truck driver, and that he was wearing his glasses, which give him 20/20 vision, when he looked at the driver.

Finch ran behind his motor home. The driver of the SUV pulled out of his spot, and Finch got in his motor home, called 9-1-1, and followed the SUV until he saw it turn on Yerby Street and the dispatcher told Finch to return to the drugstore. After Officer York met Finch at the drugstore, Finch filled out an incident report, and then was asked to "try to identify a person that they had gotten down at the apartments."

When they arrived at the apartments, Finch recognized the suspect vehicle as the vehicle the robber had been driving. Finch stayed in the patrol car. Detective Ellison got in the car with him and said "I'm going to pull this person out and I want you to see if this is the person." Ellison got the suspect out of the back of the other patrol car and put him in front of the hood of the car that Finch was in. Finch testified that he got a good look at the suspect, and that he was "[a] hundred percent" sure and "certain" that it was the person who had pulled a gun on him. When asked how he could be so sure, Finch testified, "Well, it'd only been 45 minutes that I had seen him with the gun in his hand pointed at me, and you don't

6

forget that quick." Finch testified that Shephard was wearing a white shirt and gray pants and a white "do-rag" at the time he identified him, which was different from the clothes he was wearing earlier, but that Finch was able to identify him "[b]y his face" and that he was "sure" it was him because he recognized his face. When Finch identified the defendant in the courtroom, he was "absolutely certain" that he was the same person who pulled the gun on him.

Kasandra Jones, Tabitha Bell's cousin, testified that she had lived at the apartment complex on Yerby Street for two years. On June 26, 2010, several of her children were playing outside and noticed police officers surrounding Tabitha's car. Kasandra went outside to talk to the police. A female officer asked her if she knew who drove the car, and she told him that it belonged to her cousin Tabitha. She told the officer that Tabitha had a boyfriend that Kasandra knew as Shawn, who was a little taller than the officer and wore his hair "kind of cut low," but that she did not know him well and so could not give a full description. She told the officer which apartment Tabitha lived in.

Officer York testified at trial. He testified that he got the call about an aggravated robbery from the dispatcher around 10:50 a.m. on June 26, 2010, and that it took him about two minutes to get close to the scene, where he observed Finch's motor home driving down Market Street. York testified that he was told

7

that they were looking for a small, gray SUV with a partial license plate of "V67." He started checking the area nearby and found a vehicle matching the description around 11:00 a.m. at an apartment complex on Yerby Street, where apartment residents told him that a "younger black male" drives the vehicle. At 11:22 a.m., York turned the scene over to Detective Ellison, and went to meet with Finch at the drugstore. While Finch was filling out an incident report, York heard over the radio that a suspect had been detained. He testified that he told Finch "[t]hat a person was detained that was supposed to be the suspect in the crime." York drove Finch to the apartments, and once at the apartments, York left Finch in his vehicle. York asked Shephard to step out of the back of another patrol car.

Detective Ellison also testified at trial. She testified that she arrived at the apartments on Yerby Street and had started taking pictures of the suspect vehicle located by Officer York when she was approached by Kasandra Jones, who told her that her cousin Tabitha Bell owned the vehicle. Jones also told her which apartment Bell lived in and Ellison went to the apartment with two other deputies. Shephard answered the door, and he was handcuffed. Shephard's pockets were searched, and two keys were found, one of which was a key to the gray SUV. Shephard was taken downstairs and placed in the back of a patrol vehicle. Ellison then requested that York bring Finch to the apartments. Ellison spoke briefly with

8

Finch, but she testified that she did not make any suggestive comments to him. Ellison said that she asked Finch to "look closely and see if he could identify the subject as the one that pointed the gun at him." Finch told her that he was "100 percent positive" that the subject was the man who had pulled a gun on him and that he had "no doubt." Ellison testified that Finch had no hesitation in his voice when he identified Shephard, and that he seemed certain. After Finch identified Shephard, Shephard was arrested.

## Motion to Suppress

In his first issue, Shephard contends that the trial court erred in denying his motion to suppress. He argues that he was under arrest as of the moment he was handcuffed and that the trial court should have suppressed evidence relating to the keys found in his pocket and Finch's on-site identification because both are the fruit of an illegal arrest. He also argues that, even if he was merely detained, and not arrested, at the time he was handcuffed, the evidence regarding the keys should have been suppressed because they were obtained in violation of the "plain feel" doctrine.

### A. Standard of Review

In reviewing a trial court's ruling on a motion to suppress evidence, we apply a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327

9

(Tex. Crim. App. 2000); *Blake v. State*, 125 S.W.3d 717, 722 (Tex. App.—Houston [1st Dist.] 2003, no pet.). We give almost total deference to the trial court's determination of historical facts that depend on credibility, while we conduct a de novo review of the trial court's application of the law to those facts. *Carmouche*, 10 S.W.3d at 327.

In a hearing on a motion to suppress, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). Accordingly, a trial court may choose to believe or to disbelieve all or any part of a witness's testimony. *Id.* "This is so because it is the trial court that observes first hand the demeanor and appearance of a witness, as opposed to an appellate court which can only read an impersonal record." *Id.* Unless a trial court abuses its discretion by making a finding unsupported by the record, we defer to its findings and will not disturb them on appeal. *Flores v. State*, 177 S.W.3d 8, 14 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

## B. Applicable Law

Generally, three categories of interaction occur between police officers and civilians: (1) consensual encounters, (2) investigative detentions, and (3) arrests. *State v. Woodard*, 341 S.W.3d 404, 411 (Tex. Crim. App. 2011); *Pennywell v.*

*State*, 127 S.W.3d 149, 152 (Tex. App.—Houston [1st Dist.] 2003, no pet.). A consensual encounter occurs when a law enforcement officer approaches an individual in public to ask questions. *Pennywell*, 127 S.W.3d at 152. An officer needs no justification for an encounter which triggers no constitutional protections. *Id.* An encounter does not constitute a seizure of the person, but a detention or an arrest does. *Id.*

In contrast, a police officer may stop and briefly detain a person for investigative purposes only if the officer, in light of his experience, has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884–85 (1968). The circumstances can give rise to a reasonable suspicion if the officer has specific, articulable facts at the time of detention which, taken together with rational inferences from those facts, lead the officer to conclude that the person detained is, has been, or soon will be, engaged in criminal activity. *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). A reasonable suspicion is more than a mere hunch or suspicion; a person may not be detained unless the circumstances objectively support a reasonable suspicion of criminal activity. *Davis v. State*, 947 S.W.2d 240, 244 (Tex. Crim. App. 1997). Whether a temporary investigative

detention is reasonable depends on the totality of the circumstances. *Woods*, 956 S.W.2d at 38.

"A law enforcement officer may stop and briefly detain a person for investigative purposes on less information than is constitutionally required for probable cause to arrest." *Foster v. State*, 326 S.W.3d 609, 613 (Tex. Crim. App. 2010) (citing *Terry*, 392 U.S. at 22, 88 S. Ct. at 1880). To effectuate an arrest, an officer must have probable cause to believe the person arrested has committed or is committing an offense. *Amores v. State*, 816 S.W.2d 407, 411 (Tex. Crim. App. 1991). Probable cause exists where the facts and circumstances within the officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a particular person has committed or is committing an offense. *Id.* at 413.

Whether a detention is an investigative detention or an arrest depends upon the facts and circumstances surrounding the detention. *Id.* at 412; *Hoag v. State*, 728 S.W.2d 375, 378–79 (Tex. Crim. App. 1987); *Hilla v. State*, 832 S.W.2d 773, 778 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd). Factors to consider include "the amount of force displayed, the duration of a detention, the efficiency of the investigative process and whether it is conducted at the original location or the person is transported to another location, the officer's expressed intent—that is,

12

whether he told the detained person that he was under arrest or was being detained only for a temporary investigation, and any other relevant factors." *State v. Sheppard*, 271 S.W.3d 281, 290–91 (Tex. Crim. App. 2008).

Police may use such force as is reasonably necessary to effect the goal of the detention: investigation, maintenance of the status quo, or officer safety. *Rhodes v. State*, 945 S.W.2d 115, 117 (Tex. Crim. App. 1997). Handcuffing alone will not necessarily convert a temporary detention into an arrest. *See id.* at 117–18; *Burkes v. State*, 830 S.W.2d 922, 924 (Tex. Crim. App. 1991); *Hilla*, 832 S.W.2d at 778. And whether an officer believes a suspect is detained or arrested is not determinative of the issue. *Amores*, 816 S.W.2d at 412; *Hoag*, 728 S.W.2d at 378; *Hilla*, 832 S.W.2d at 778. Rather, we look to the reasonableness of the officer's actions, which is to be judged from the perspective of a reasonable officer at the scene, rather than with the advantage of hindsight. *Rhodes*, 945 S.W.2d at 118. "Furthermore, allowances must be made for the fact that officers must often make quick decisions under tense, uncertain and rapidly changing circumstances." *Id.*

An investigative detention implies that the obtrusive act is for the purpose of actually investigating. *Burkes*, 830 S.W.2d at 925. Thus, where no investigation is undertaken, the detention cannot be considered investigatory and rises to the level of an arrest. *Id.* In any case, a reviewing court considers the totality of the

13

circumstances in determining whether a stop is a brief investigative detention or an arrest. *See Francis v. State*, 896 S.W.2d 406, 411 (Tex. App.—Houston [1st Dist.] 1995, pet. dism'd).

## C. Analysis

### 1. Detention or Arrest?

We must first determine whether Shephard was arrested or merely detained when he was handcuffed at the door of his girlfriend's apartment, because this determines the applicable constitutional parameters. *See Amores*, 816 S.W.2d at 411. To do so, we consider the relevant factors in light of the totality of the circumstances. *See Sheppard*, 271 S.W.3d at 290–91.

With respect to the amount of force displayed, the trial court found that Shephard opened the apartment door, identified himself, stepped on to the porch, and was placed in handcuffs and put in the back of a patrol car. *Id.* at 291 (factor to consider is amount of force displayed). It also found that Detective Ellison approached the door with two other officers, but that their weapons were not drawn. [1]

---

[1] The only mention of weapons at the hearing on the motion to suppress was Detective Ellison's testimony that she did not recall anyone unholstering their weapon. Some evidence at trial indicated that the officers' weapons were drawn, but where, as here, the motion to suppress was not relitigated at trial, we measure the trial court's fact findings and ruling on the motion to suppress against only the

Shephard argues that the fact that he was handcuffed and placed in a patrol car means he was under arrest. But officers may use force as is reasonably necessary to effect the goal of the detention, which, in this case, was to maintain officer safety during the ongoing investigation. *See Rhodes*, 945 S.W.2d at 117–18. Here, the officers were investigating an armed robbery that had just been committed with a gun that had yet to be located. Detective Ellison was told that the man who had been driving the suspect vehicle may be in the apartment and that Finch was nearby and could be brought to the scene for an identification quickly. Considering the circumstances, the trial court did not err in concluding that handcuffing and placing Shephard in the patrol car until Finch's arrival was reasonably necessary to effect the goal of the detention. *See Sheppard*, 271 S.W.3d at 290 (investigative detention, not arrest, where suspect was handcuffed only long enough for officer to conduct investigation of area); *Balentine v. State*, 71 S.W.3d 763, 771 (Tex. Crim. App. 2002) (handcuffing and escorting appellant to patrol car did not transform investigative detention into arrest, where officer had reasonable concern for safety because he was investigating crime involving gun).

Regarding the duration of the detention and efficiency of the investigative process, the trial court found that Shephard was detained for no more than 15

evidence adduced at the hearing on the motion. *See Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996).

minutes before being identified by Finch and being told that he was under arrest. *See Sheppard*, 271 S.W.3d at 290–91 (factors to consider are length of detention and efficiency of investigative procedure). During this time, Finch was brought to the apartments from the drugstore and Shephard remained at the apartment complex where he was first detained. *See id.* at 291 (investigation conducted at original location supports finding that detention was investigatory); *Castro v. State*, 373 S.W.3d 159, 165 (Tex. App.—San Antonio 2012, no pet.)(detention's duration must show that officers efficiently pursued investigation in order for detention to be investigatory). Moreover, the trial court found that Detective Ellison immediately sought to locate Tabitha Bell, the owner of the vehicle and the lessee of the apartment, to obtain consent to search the vehicle and the apartment. We conclude the duration of the detention was reasonable and the investigatory procedure efficient. *See Castro*, 373 S.W.3d at 165 (25 to 45 minute long detention was not unreasonable where officer had to transport suspect to second location for on-site identification).

Finally, examining the officer's expressed intent, the trial court found that no one told Shephard that he was under arrest when he was handcuffed and placed in the back of the patrol car. *See Sheppard*, 271 S.W.3d at 291 (officer's expressed

intent is factor to consider). Detective Ellison testified that Shephard was detained, not arrested, during that time.

Considering the relevant factors and the totality of the circumstances, we conclude that the trial court did not err in concluding that Shephard was detained, and not arrested, between the time that he was handcuffed and the time he was identified by Finch and told that he was under arrest.

**2. Did the officers have reasonable suspicion to detain Shephard?**

Because Shephard was merely detained and not arrested until after he was identified by Finch, the officers needed only reasonable suspicion, not probable cause, to detain Shephard. *See State v. Elias*, 339 S.W.3d 667, 674 (Tex. Crim. App. 2011) (citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989)); *Foster*, 326 S.W.3d at 613. We conclude that the trial court did not err in finding that the officers had reasonable suspicion to detain Shephard when they did.

Reasonable suspicion exists when an officer has "specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity." *Elias*, 339 S.W.3d at 674. Here, the trial court found that Officer York responded to a dispatch stating that an armed robbery had

17

just been committed by a black male in his early 20s driving a silver small SUV with a partial license plate of V67. The trial court further found that Officer York located a suspect vehicle matching this description and ascertained that the vehicle had been recently driven. The trial court found that Officer York relayed this information to Detective Ellison, who upon investigating the vehicle, was approached by a woman who told her that the vehicle belonged to her cousin, Tabitha Bell, that Bell's boyfriend had been driving it, and identified which apartment in the complex was Bell's. When the officers approached that apartment, a man matching the description Finch gave answered the door. Based on these circumstances, the trial court correctly concluded the officers had reasonable suspicion to detain Shephard. *See Sheppard*, 271 S.W.3d at 292; *Rhodes*, 945 S.W.2d at 118–19.

In sum, because the trial court correctly concluded that Shephard was detained, and that the officers had reasonable suspicion to detain Shephard, the trial court did not err in refusing to suppress evidence regarding Finch's on-scene identification or the keys in Shephard's pocket on the basis that they were fruits of an illegal arrest. *See Castro*, 373 S.W.3d at 167 (because defendant was merely detained, and not arrested, trial court did not err in refusing to suppress evidence on the basis that evidence was the fruit of illegal arrest).

18

**3. Were the keys in Shephard's pocket seized in violation of the plain feel doctrine?**

On appeal, Shephard contends that even if he was merely detained, rather than arrested, outside the apartment, the keys seized from his pocket should be suppressed because they were seized in violation of the "plain feel" doctrine. *See Baldwin v. State*, 278 S.W.3d 367, 371–72 (Tex. Crim. App. 2009) ("plain feel" doctrine only permits an officer to pat-down a validly detained suspect for contraband; officer must have probable cause in order to conduct a search for non-weapon contraband or other evidence).

We conclude this argument is waived because it does not comport with Shephard's objection in the trial court. In his written motion to suppress, Shephard contended that he was "arrested without warrant and without probable cause," and that "the search of the Defendant's person and the premises where he was located incident to such arrest was therefore illegal and all fruits of the search must be suppressed." He did not, however, argue that the seizure of his keys was improper if he was detained rather than arrested.

Likewise, during the hearing on the motion to suppress, Shephard argued that he had been arrested without probable cause at the time he was first handcuffed. He identified only the on-scene identification as the evidence that should be suppressed, and he did not argue that the keys were wrongfully seized

19

even if he was only detained. Accordingly, we hold that Shephard has failed to preserve error on this issue. TEX. R. APP. P. 33.1(a); *see Rothstein v. State*, 267 S.W.3d 366, 373–74 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd)(because appellant's argument on appeal did not comport with any objection raised in the motion to suppress or at the suppression hearing, appellant failed to preserve error on issue)(citing *Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005)).

We hold that the trial court did not err in denying Shephard's motion to suppress, and we overrule Shephard's first issue.

### Motions for Mistrial

In his second issue, Shephard contends that the trial court abused its discretion in denying his motions for mistrial after prosecutors improperly commented on Shephard's silence.

## A. Standard of Review and Applicable Law

An appellate court reviews a trial court's ruling on a motion for mistrial for an abuse of discretion. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). To determine whether a trial court abused its discretion by denying a mistrial, we balance the three *Mosley* factors: (1) the severity of the misconduct or the magnitude of the prejudicial effect, (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the misconduct. *Ramon v.*

20

*State*, 159 S.W.3d 927, 929 (Tex. Crim. App. 2004) (citing *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998)). We must uphold a trial court's ruling on a motion for mistrial if it was within the zone of reasonable disagreement. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (en banc)). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins v. State*, 135 S.W.3d. 72, 77 (Tex. Crim. App. 2004).

**C. Analysis**

Here, Shephard first complains that the State asked Detective Ellison, "Did the Defendant ever give you an explanation of why he had those keys in his pocket?" Shephard's objection to the question was sustained and he requested a mistrial, which was denied. Shephard did not ask that the jury be instructed to disregard the question.

Shephard's second complaint is that, during closing argument, the prosecutor said, "He can't change the fact that when Travis York had him out in front of the car, in front of Richard Finch, the Defendant not in response to anything, he never said what's happening? What's going on?" Shephard's objection was sustained, and the trial court instructed the jury to disregard the statement, but denied Shephard's motion for a mistrial.

21

The Fifth Amendment to the United States Constitution states, "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Under well-established Fifth Amendment law, the State is prohibited from commenting on a defendant's refusal to testify at trial. *See Salinas v. State*, 369 S.W.3d 176, 177–78 (Tex. Crim. App. 2012), *aff'd*, 570 U.S. __, 133 S.Ct. 2174. However, "pre-arrest, pre-Miranda silence is not protected by the Fifth Amendment right against compelled self-incrimination, and . . . prosecutors may comment on such silence regardless of whether a defendant testifies." *Id.* at 179. In *Salinas*, the defendant voluntarily accompanied police officers investigating two homicides to the police station for questioning. *Id.* at 177. After an hour of answering questions, he remained silent when asked whether shotgun shells found at the scene would match the shotgun found at his home. *Id.* Several months later, he was charged with murder and eventually arrested. *Id.* The State introduced evidence of his silence in response to the question regarding the shotgun at trial, and the Court of Criminal Appeals held that, because the silence was pre-arrest, it was admissible. *Id.* The Supreme Court of the United States affirmed.

The statement in closing argument about which Shephard complains is a comment on Shephard's silence during the pre-trial identification, which took place just before he was arrested. Because the comment pertains to pre-arrest, pre-

22

Miranda silence, it is not protected by the Fifth Amendment, and the trial court therefore did not err in denying Shephard's motion for mistrial related to this comment. *See id.* at 179.

The other comment about which Shephard complains—whether Shephard ever gave any explanation for having the keys—likewise does not warrant reversal. When, as in this case, a party requesting a mistrial does not first seek a lesser remedy, a reviewing court cannot reverse the trial court's judgment if the alleged error could have been cured by a less drastic alternative. *Ocon v. State*, 284 S.W.3d 880, 884–85 (Tex. Crim. App. 2009). An instruction to disregard is presumed to cure all but the most blatant comments. *Moore v. State*, 999 S.W.2d 385, 405–06 (Tex. Crim. App. 1999). Here, the comment was not so blatant that it could not have been cured by an instruction to disregard had Shephard requested one. Because Shephard did not request an instruction to disregard, the trial court did not err in denying his motion for mistrial. *See Wright v. State*, 374 S.W.3d 564, 583 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (trial court did not err in denying motion for mistrial where defendant did not request instruction that jury disregard State's question that defendant was only person that could explain her feelings at time of the crime).

We hold that the trial court did not abuse its discretion in denying Shephard's motions for mistrial, and we overrule Shephard's second issue.

## Pre-trial Identification

In his third issue, Shephard contends that the trial court erred in admitting evidence of Finch's impermissibly suggestive pre-trial identification.

### A. Standard of Review and Applicable Law

The admissibility of an identification is a mixed question of law and fact that the appellate court reviews de novo. *See Loserth v. State*, 963 S.W.2d 770, 773 (Tex. Crim. App. 1998); *Brown v. State*, 29 S.W.3d 251, 254 (Tex. App.—Houston [14th Dist.] 2000, no pet.). A pretrial identification procedure may be so unnecessarily suggestive and conducive to mistaken identification that to use that identification at trial would deny the accused due process of law. *Neil v. Biggers*, 409 U.S. 188, 196, 93 S. Ct. 375, 380 (1972); *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995). Therefore, the reviewing court employs a two-step analysis, determining whether the pretrial procedure was impermissibly suggestive, and if so, whether the suggestive pretrial procedure gave rise to a very substantial likelihood of irreparable misidentification. *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993); *Santos v. State*, 116 S.W.3d 447, 451 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd).

An in-field showup, also called a one-on-one showup, in which a single suspect is shown to the complainant shortly after the crime is committed, is generally considered to be impermissibly suggestive. *See Stewart v. State*, 198 S.W.3d 60, 63 (Tex. App.—Fort Worth 2006, no pet.); *Pace v. State*, 986 S.W.2d 740, 744 (Tex. App.—El Paso 1999, pet. ref'd). If the identification procedure was impermissibly suggestive, the following five factors should be "weighed against the corrupting effect of any suggestive identification procedure in assessing reliability under the totality of the circumstances": (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and confrontation. *Webb v. State*, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988) (citing *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253 (1977) (citing *Neil*, 409 U.S. at 199–200, 93 S. Ct. at 382)). We may also consider other relevant factors in evaluating the reliability of the witness's identification. *Delk*, 855 S.W.2d at 706; *Pace*, 986 S.W.2d at 745. We consider these factors, all issues of historical fact, deferentially in a light favorable to the trial court's ruling. *Loserth*, 963 S.W.2d at 773; *Williams v. State*, 243 S.W.3d 787,

25

789 (Tex. App.—Amarillo 2007, pet. ref'd); *Gilstrap v. State*, 65 S.W.3d 322, 327 (Tex. App.—Waco 2001, pet. ref'd).

**C. Analysis**

Assuming, without deciding, that the one-on-one showup was impermissibly suggestive, we conclude that it did not create a very substantial likelihood of irreparable misidentification and, therefore, the trial court did not err in admitting it.

Under the first factor, we examine the opportunity of the witness to view the criminal at the time of the crime. *Webb*, 760 S.W.2d at 269. Finch testified that he heard someone in the small SUV say "Give me your stuff," that he turned around and looked directly at the driver, and that he got a "good look" at the driver. Finch was within a few feet of the driver, because he was standing between his motor home and the passenger-side window of the SUV, which was parked in the parking spot next to him.

Under the second factor, we consider the witness's degree of attention. *Id.* The record reflects that Finch was alert and paid close attention to the surrounding circumstances. He testified that he noticed as he walked up to his motor home that the small SUV next to it was running, and that the passenger window was rolled down. Finch reacted by resisting the robbery, and, in the midst of the commotion,

26

was able to discern the suspect's license plate and even follow the suspect while calling 9-1-1. *See Wilson v. State*, 267 S.W.3d 215, 218 (Tex. App.—Waco 2008, pet. ref'd).

The third factor is the accuracy of the witness's description of the criminal. *Webb*, 760 S.W.2d at 269. Finch described the suspect to the 9-1-1 dispatcher as "a black male in his early 20s, driving a silver small passenger SUV with a partial license plate of 'V67.'" He later told Officer York that the suspect was wearing a black shirt and a black "do-rag." Shephard was a black male in his early 20s, and his girlfriend told the police that he had been driving her car that day, which matched the description given by Finch. At the time he was detained, Shephard was wearing a white "do-rag" and shirt. Finch had reported a "do-rag," albeit black, and a black shirt.

The fourth factor to consider is the level of certainty demonstrated by the witness at the confrontation. *Webb*, 760 S.W.2d at 269. Detective Ellison testified that Finch told her when he identified Shephard on the scene that he was "100 percent positive" that Shephard was the person who had pulled a gun on him. Ellison testified that Finch had no hesitation in his voice and seemed certain of his identification. Finch also testified that he got a good look at the suspect, and that

27

he was "[a] hundred percent" sure and "certain" that Shephard was the person who pulled a gun on him.

Finally, with respect to the length of time between the crime and confrontation, the record reflects that about an hour elapsed between the crime and the identification. *Id.* at 269. Finch's receipt from the drugstore was timestamped 10:44 a.m., and Shephard was arrested at 11:53 a.m., after being identified by Finch.

Shephard argues that Officer York's testimony that he told Finch "[t]hat a person was detained that was supposed to be the suspect in the crime" and Finch's testimony that Detective Ellison told him "I'm going to pull this person out and I want you to see if this is the person" is evidence that the officers improperly suggested that he was the person who committed the crime. But Finch, when cross-examined regarding whether the officers told him that Shephard had committed the crime or had been the driver of the SUV, testified only that he was asked whether Shephard was the person who had held him up. Detective Ellison testified that she asked Finch to "look closely and see if he could identify the subject as the one that pointed the gun at him."

Shephard also argues that the fact that he was handcuffed and placed in the back of a patrol car gave rise to a very substantial likelihood of irreparable

28

misidentification. These facts weigh against admissibility, and the trial court would have been within its discretion to consider them. *See Delk*, 855 S.W.2d at 706; *Pace*, 986 S.W.2d at 745. However, considering the totality of the circumstances, including the fact that Shephard had the keys to the SUV in his pocket, we conclude that the pre-trial identification did not create a "very substantial likelihood of irreparable misidentification." *See Williams*, 243 S.W.3d at 791 (no substantial likelihood of irreparable misidentification where, 30 minutes after burglary, officer brought detained suspect to complainant's house in back of patrol car and told complainant "I need you to identify the man and then step away from the car."); *Pace*, 986 S.W.2d at 745 (no substantial likelihood of irreparable misidentification where victim was asked to identify suspect pulled from back seat of patrol car); *Wilson*, 267 S.W.3d at 218–19 (no substantial likelihood of irreparable misidentification where, although description of perpetrator did not match identified person, evidence showed victim got "a good look" at perpetrator, that victim was attentive to surroundings, that victim was "100 percent sure" of identification, and a short time passed between crime and identification).

We overrule Shephard's third issue.

29

## Conclusion

We affirm the judgment of the trial court.


Rebeca Huddle
Justice

Panel consists of Chief Justice Radack and Justices Massengale and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).